COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-05-401-CV

RICHMOND CONDOMINIUMS APPELLANT

V.

SKIPWORTH COMMERCIAL 

PLUMBING, INC. APPELLEE

------------

FROM THE 89TH DISTRICT COURT OF WICHITA COUNTY

------------

OPINION ON REHEARING

------------

After considering our prior opinion on appellant’s motion for rehearing, we deny the motion, but we withdraw our opinion and judgment dated July 26, 2007, and substitute the following.

I.  Introduction

In four issues, Appellant Richmond Condominiums asserts that (1) the jury verdict finding that Skipworth Commercial Plumbing, Inc. (“Skipworth”) was not negligent in causing the fire at issue is against the great weight and preponderance of the evidence presented, (2) the court erred by failing to sanction or otherwise discipline counsel for Skipworth for his ex parte communication with members of the Richmond Condominiums joint venture during the pendency of the litigation, (3) the court committed reversible error in admitting speculative testimony from nonexperts in violation of the court’s limine order and over the objection of counsel for Richmond Condominiums and in forcing Richmond Condominiums to present evidence of its insurance through Western Heritage Insurance Company to the jury, and (4) counsel for Skipworth made improper jury arguments during his closing argument that were so prejudicial and inflammatory that they were incurable and constitute reversible error.  We affirm.  

II.  Factual and Procedural Background

This is the case of “who started the fire?”  The suit arose from a fire that occurred on March 3, 2002, at the Richmond Condominiums in Wichita Falls, Texas.  On the site that day were plumbers employed by Skipworth who were “sweating” copper pipes with open flame torches for the eventual installation of kitchen and bathroom fixtures in the living units on the west side of the large, multi-story building.

A.  The Richmond Condominiums Project

Randle Forcher (“Forcher”) purchased the property at issue for $100,000 and began the project with the financial assistance of his son-in-law, Randy Wachsman (“Wachsman”).  However, Wachsman ultimately did not wish to finance the project (which later became known as “Richmond Condominiums”) by himself and arranged to bring in other investors.  Richmond Condominiums eventually became a joint venture with Forcher, Larry Scott (“Scott”), Steve Priester (“Priester”), Scott Skipworth, and Wachsman (collectively the “joint venturers”).

Forcher provided the project’s day-to-day oversight and acted as the project foreman, keeping a regular “eye on things.”  Forcher had complete control over the execution of the “trade’s” work at the job site.  By the time of the fire at issue, the project was 60% to 70% complete and more than $178,000 had already been expended in excess of the construction loan, while no units had been sold or leased.

The building at issue had previously caught fire.  During the renovation, Forcher hired “transients” from the nearby mission to do odd jobs, but it became necessary for Forcher to let some of them go.  Also, the project experienced multiple break-ins and thefts.

Following the March 2002 fire, the joint venture made a claim on its fire insurance policy with Western Heritage Insurance Company (“Western Heritage”), which paid $938,189.72 and was subrogated to the joint venture’s rights against Skipworth and any other potential tortfeasors.  Western Heritage then filed suit against Skipworth in the name of its subrogor, Richmond Condominiums.
(footnote: 1)
 B.  The Day of the Fire

On the date of the fire, the east side of the building was largely complete, while the west side was still in the “rough-out” phase.  The people known to be present in the building on the day of the fire included two Skipworth employees, John Neal (“Neal”) and Philip Henderson (“Henderson”), Forcher and his helper, Steve Humphries (“Humphries”), electrical contractors A-Bar Electric (with whom Richmond Condominiums settled), and possibly the painters, Ramon’s Painting.
(footnote: 2)  While most people present in the building on the day of the fire were working on the east side, they took trash out and entered and exited the building through the west side where the fire occurred.

The trial testimony indicated that Skipworth employees were the only people working on the west side of the building on the day of the fire, and on that day, Neal and Henderson were installing or “sweating” copper pipes.  Neal is a licensed journeyman plumber.  At some point, Henderson dropped his pipe cutter down an opening into the basement.  At approximately 4:30 p.m., Neal and Henderson completed their work for the day, then spent ten to fifteen minutes in the immediate area collecting their tools and looking around to ensure that no risk of fire was present.  They then proceeded to the basement to retrieve Henderson’s pipe cutter and discuss the next day’s work, spending approximately thirty to forty minutes in the basement on the west side.  Neal then returned to the area in which he had been working that day to look around and ensure that the area was safe and clean and that there was no danger of fire. In all, Skipworth’s employees spent at least fifty minutes to an hour in the building after completing their actual work on the day in question.  At no time did the Skipworth employees testify that they noticed anything unusual or any risk of fire.

Neal testified that he was careful to avoid scorching the wood wall studs around which he was working.  Forcher, who was present throughout and oversaw Skipworth’s work, never mentioned or suggested that Skipworth had scorched or caused fire damage to the wood studs.  The investigating authorities were not made aware of any evidence Skipworth ever scorched or burned a wall stud during its operations on the project.

However, the pipes Skipworth was sweating were located in close proximity to the wooden structural members of the building.  The wooden members were quite old and dry, the building having been constructed in the 1920s.  Despite this proximity, Skipworth did not use an asbestos blanket or other flame retardant material to protect the wood from the effects of the torches, and the Skipworth employees were the last to leave that day.  There was no evidence of anyone else in the building between their leaving and the time of the fire.

Neal further testified that they were generally working within six to eight inches of the wooden structural members of the building during their pipe sweating operations.  Neal stated that the fire code requires that, when working in close proximity to anything combustible, a “shield” or a “blanket” should be used to protect the wood from fire and ensure safety of the operation.  Neal also admitted that no “shield” or “blanket” was used, although he understood the requirement and its purpose.  Skipworth’s “fire watch” consisted of Neal’s packing up tools and going down to the basement to search for a lost tool.

The building itself contained a newly installed fire suppression system that had been tested by the Wichita Falls Fire Marshal and approved for operation but was turned off on the day of the fire.  There were at least two cigarette smokers present in the building—Forcher and Humphries.  Flammable hydraulic fluid was present in the storage room on the second floor of the west side of the building,
(footnote: 3) and combustible paint thinner and lacquer were located on the east side.  Finally, temporary lighting had been installed on the west side of the building by the electricians. 

C.  The Fire

Neal and Henderson departed the building between 5:45 p.m. and 6:00 p.m.  Henderson drove past the building at approximately 7:00 p.m. and observed no evidence of fire or anything out of the ordinary.
(footnote: 4)  The fire was reported at 8:55 p.m.  James Graham (“Graham”), who is the Assistant Fire Marshal of Wichita Falls and who served as the lead origin and cause investigator regarding this matter, arrived at the scene eleven minutes after the fire was first reported.
(footnote: 5)  Graham immediately began gathering information regarding the fire, knowing that once the fire was out, it would be his job to “figure out what happened.”

D.  The Fire’s Aftermath

While the actual fire was put out within hours after the firefighters arrived, firefighters continued to put water on the debris “on and off” over the next few days.  Graham was initially present at the fire for six continuous hours before going home to shower, put on his uniform, and return to the scene.  Graham then spent most of the next ten days at the scene.  Shortly after the fire, authorities decided that safety concerns required demolishing the building’s remaining walls.  As part of his investigation, Graham took hundreds of pictures and video recordings of the demolition process.  From an investigative standpoint, the demolition of the building destroyed most of the relevant evidence before Graham could actually enter the site.

E.  Graham’s Investigation and Conclusions

At trial, Graham explained the methodology he employed while investigating the fire.  As Graham explained it, “[M]y job is to do the origin and cause investigations of fires that I’m assigned to.”  In addition to having been at the scene of the fire within minutes of its being reported, Graham was already familiar with the building through his inspection and approval of the fire suppression system and elevator.

Graham also personally interviewed all the relevant witnesses and reported as follows:

Forcher.  Forcher did not initially disclose the presence of flammable hydraulic fluid.  However, subsequent conversation revealed the hydraulic fluid had been moved from the east side of the building to a storage room on the west side of the building, where some of the electrical material was being stored.  Forcher never suggested Skipworth had scorched any wood-studs in the building; instead, Forcher “specifically made the comment that he was happy with the way things were going relative to all the trades,” including Skipworth.

A-Bar Electric.  Larry Hickerson of A-Bar Electric provided information regarding the building’s temporary and permanent lighting and electrical system in place at the time of the fire.

Otis Elevator.  Robert Butler and Lorenzo Parish of Otis Elevator provided information regarding installation of the elevator and leaving hydraulic fluid behind at the scene.

Skipworth.  Neal and Henderson related their activities on the day in question, which was in accordance with applicable building code requirements.

Ramon Painting.  The painters (Ramon De’Oliceira and Michael Saenz) described their activities in the building on the day in question, the materials they left behind (including paint thinner and lacquer), and their observations.  Graham was unable to identify the source of the unusual odors the painters purportedly noticed as they departed.

Henderson’s Wife.  Shalena Henderson (the wife of Neal’s assistant plumber) confirmed her husband’s statement that she and her husband observed the building at approximately 7:00 p.m. on the night of the fire and noticed nothing unusual.

Graham determined that the fire originated on the west side of the building, where Skipworth, and only Skipworth, had been working. However, based on his investigation of the fire, Graham believed that no single cause was more probable than another.  Graham admitted that he could not rule out Skipworth’s pipe sweating operations as the cause of the fire.  

Graham was unable to determine the exact point of origin of the fire or its cause.  According to Graham, because there were any number of possible causes—none of which was more likely than another—the governing standards of fire investigation required the investigator to conclude the cause as “undetermined.”
(footnote: 6)  On direct examination at trial by Richmond Condominiums, Graham categorically rejected the contention that Skipworth’s employees were the only possible cause of the fire.

Q. So the only possible source of ignition during the day would be Skipworth Plumbing employees, John Neal and Phillip Henderson?

A. That’s not true.

Graham’s conclusion that the cause and origin of the fire could not be determined, meaning that no one cause was more likely than another, was based on the following:

1. In his conversations with Graham, Forcher never indicated or suggested that Skipworth had scorched any of the wood studs around which its employees were working.  In fact, Forcher indicated to Graham that he was pleased with Skipworth’s work.

2. The presence of temporary lighting on the west side of the building.

3. Numerous parties had access to the west side of the building on the day of the fire.

4. The fact that the fire itself and subsequent demolition of the building by the authorities destroyed most of the physical evidence pertaining to the fire.

5. Graham’s numerous personal interviews of virtually all known persons with potentially relevant knowledge regarding the fire.

6. The lack of any evidence found during the course of Graham’s investigation of wood studs having been scorched by Skipworth’s employees.

7. The record of prior break-ins and the thefts at the building. 

8. The presence of transients in the immediate area of the building and the unusually cold weather on the night of the fire.

9. The presence of flammable liquids at the scene left by the painters, including paint thinner and lacquer. 

10. The presence of flammable hydraulic fluid moved from the east side to the west side of the building by Forcher.

11. Skipworth’s compliance with building code requirements regarding “fire watch” and protective measures.

12. The presence of cigarette smokers Forcher and Humphries at the scene the day of the fire.

As a result of his investigation, Graham testified that each of the following were also equally possible causes of the fire at issue, in addition to Skipworth’s “sweating” copper pipes:

1. The permanent electrical system in the building.

2. The temporary electrical system in the building.

3. Arson.
(footnote: 7)
 4. Transients.

5. Cigarette smokers.

6. The paint thinner or lacquer.

However, Graham did admit that he had no evidence to support any of these alternative theories of the fire’s cause, and his testimony established that he could neither eliminate these alternative causes nor substantiate those theories. 

F.  Richmond Condominiums’ Retained Expert
 
Buddy Jenkins 

On the day following the fire, Richmond Condominiums retained Buddy Jenkins (“Jenkins”) of Rimkus Consulting Group, Inc. to investigate the fire.  As to his qualifications and foundation for his testimony, Jenkins testified as follows:

Q. [W]ithout going into a whole lot of detail unless I ask for it, you could just tell the jury your training and experience as it relates to determining the cause and origin of fires.

A.  I got out of the military in 1959.  I went to work with the fire department at that time. I worked with the City of Irving for 14 years.  I transferred from there over to the Department of Public Safety at DFW Airport.  I worked there 14 more years.  I went up through the ranks, starting at the bottom going with -- to -- when I retired in ‘87, I retired as a division commander.  And I stayed retired for about a year, worked on my farm, had some things I wanted to do there. . . . [A]nd  then I started doing what I’m doing right now.

Q.  What training have you had in cause and origin investigation, educational training?

A.  Well, I’ve -- I’ve got 28 years working with municipal fire departments.  And during those 28 years -- especially after I obtained the rank of district officer, which would be either lieutenant or captain, I held both positions.  Once you get into those positions you get into an area where you start making opinions and find the cause and origin of fires.  When it gets to a certain type and size of fires, then we call in the Fire Marshal and his staff.  But -- and then eventually I worked in with the fire investigation people and -- before I retired in 1987.

Jenkins first visited the scene three days after the fire occurred.  When Jenkins arrived at the scene, the debris had been removed.  In conjunction with his investigation, Jenkins interviewed Forcher and Scott Skipworth.  Jenkins indicated that he was not as familiar with the potentially relevant building codes as someone like Graham.  Jenkins told the jury on direct examination that it was his opinion that the fire was caused by negligent plumbing activities and that there were no other potential causes of the fire.

Jenkins never spoke with plumbers Neal and Henderson or the painters who were working in the building on the day of the fire, and he never spoke to the electricians, who Jenkins erroneously thought were not present in the building on the day of the fire.  Jenkins was not certain who was in the building on the day of the fire.

At trial, Jenkins identified the following fire-related factors: (1) Skipworth’s failure to use protective shields while sweating pipes, (2) problems with Skipworth’s “fire watch,” (3) “code violations” by Skipworth, (4) scorched wood studs where Skipworth was sweating copper pipes, and (5) his conclusion, based on his experience, that torch operations regularly cause fires.  Jenkins stated that the only logical and reasonable conclusion was that Skipworth’s pipe sweating operations caused the fire.  Although Jenkins identified these factors in his trial testimony to support his opinion that Skipworth caused the fire, they do not appear in his report of April 16, 2002, or in his verified deposition.

Jenkins testified that Skipworth’s employees violated the applicable fire code for Wichita Falls when they failed to conduct a proper “fire watch”, and were using torches in close proximity to wooden structural members.

Jenkins also acknowledged to the jury that he had previously identified other possible causes of the fire at issue.  One of “the most likely causes of the fire” identified by Jenkins was “extension cords and/or work lights left unattended.” Other possible causes identified by Jenkins included an electrical arc, a hot light, electrical equipment, flammable fluid including hydraulic fluid and paint thinner, an electrical short, a match, and cigarette smoking.  Further, Jenkins told the Wichita Falls Fire Marshal he could not state whether the fire was the result of an electrical event, heat from the plumbers, or a smoking incident.

G.  The Fire Marshal’s Criticism of Jenkins’s Investigation

Graham criticized Jenkins’s investigation on the whole as “[u]nprofessional, unreliable, and unethical.”  Graham was present during Jenkins’s first visit to the fire scene on March 7 during the demolition phase. Graham testified that Jenkins’s first visit to the scene lasted less than five minutes and concluded with Jenkins stating, “There’s nothing for me to do now.”  Jenkins’s second visit lasted less than one hour.

Graham also criticized the fact that Jenkins never took time to interview all the relevant witness—e.g., the painters or the plumbers.  He further criticized Jenkins’s claims that he found physical evidence at the scene that supported his scorched-wood-studs theory of causation as dubious and unprofessional, given that Jenkins took no pictures of such evidence despite having a camera with him while at the scene, nor did he sketch the location and nature of this purportedly key evidence.  Graham also questioned Jenkins’s willingness to dismiss other possible causes, given that virtually all of the evidence was destroyed by the fire or in the demolition process.  Graham stated that if you cannot find the remains of a possible ignition source (i.e., cause) you know to have been present, governing fire investigative standards preclude an investigator from eliminating it as a possible cause, yet this is precisely what Jenkins did according to Graham.

Wichita Falls Fire Marshal David Collins indicated that the cause of the fire at issue was correctly characterized as “undetermined.”

H.  The Individual Joint Venturers’ Testimony

During trial, Richmond Condominiums asked Wachsman for his opinion about the value of the building before and after the fire.  Richmond Condominiums also inquired as to whether Wachsman had any opinions as to how the fire started.  Wachsman testified that he had personally hired Skipworth to do plumbing work for him in the past and continued to do so because he believed they did good, safe, and code-compliant work.  Wachsman knew of no evidence indicating that Skipworth caused the fire at issue.  Instead, Wachsman believed that the fire was merely an accident for which Skipworth should not be sued.

Similarly, Priester and Scott, two of the other joint venturers, testified that they knew of no evidence tending to show that Skipworth was responsible for the fire.  Moreover, while Priester, Scott, and Wachsman were participants in the joint venture, none of them wished to individually recover against Skipworth.

I.  The Jury’s Deliberations, Verdict, and Post-Verdict Proceedings

The jury began its deliberations on Richmond Condominiums’ claim of negligence against Skipworth at approximately 2:00 p.m. on June 30, 2005.  Forty-five minutes later, the jury rendered its unanimous verdict in favor of Skipworth, and the trial court discharged the jury.  On August 15, 2005, the trial court entered a final judgment in favor of Skipworth based on the jury’s verdict.

On September 15, 2005, Richmond Condominiums filed a motion for new trial.  The motion for new trial contended that the jury’s verdict was against the great weight and preponderance of the evidence and that Skipworth’s closing argument was incurably prejudicial or inflammatory.  Skipworth responded to the motion for new trial on October 11, 2005.  The motion for new trial was overruled by operation of law, and Richmond Condominiums filed a notice of appeal on November 14, 2005.

III.  Sufficiency of the Evidence

In its first issue, Richmond Condominiums complains that the jury finding that Skipworth was not negligent is against the great weight and preponderance of the evidence.  We disagree.  

A. Standard of Review

In reviewing an issue asserting that a finding is “against the great weight and preponderance” of the evidence, we must consider and weigh all of the evidence and set aside the finding only if the evidence is so weak or the finding is so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust.  
Dow Chem. Co. v. Francis
, 46 S.W.3d 237, 242 (Tex. 2001); 
In re King's Estate
, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

Generally, we do not have to detail supporting evidence when upholding factual sufficiency of the evidence underlying the trial court’s judgment.  
Gonzalez v. McAllen Med. Ctr., Inc.
, 195 S.W.3d 680, 681 (Tex. 2006); 
Ellis County State Bank v. Keever
, 888 S.W.2d 790, 794 (Tex. 1994).
  Findings of fact are the exclusive province of the jury or trial court.  
Bellefonte Underwriters Ins. Co. v. Brown
, 704 S.W.2d 742, 744–45 (Tex. 1986).  A court of appeals cannot make original findings of fact; it can only “unfind” facts.  
Tex. Nat'l Bank v. Karnes
, 717 S.W.2d 901, 903 (Tex. 1986).

When conducting a factual sufficiency review, a court of appeals must not merely substitute its judgment for that of the trier of fact.  
Golden Eagle Archery, Inc. v. Jackson
, 116 S.W.3d 757, 761 (Tex. 2003).  The trier of fact is the sole judge of the credibility of witnesses and the weight to be given to their testimony.  
Id
.

B. Application

As detailed above, our review of the evidence demonstrates a clear conflict in the positions of the parties, with both positions being supported by expert and lay testimony.  For example, Jenkins testified that the fire at issue was caused by negligent plumbing activities and there were no other potential causes.  Conversely, Graham was not able to determine the point of origin of the fire and concluded that the cause was undetermined.  The jury agreed with Skipworth, and f
indings of fact are the exclusive province of the jury.  
See Bellefonte Underwriters
, 704 S.W.2d at 744–45.  
Under these circumstances, we cannot say that the evidence demonstrates that the jury findings are clearly wrong and unjust.  
See Dow Chem.
, 46 S.W.3d at 242.
  We overrule Richmond Condominiums’ first issue.

IV. Improper Behavior of Skipworth’s Counsel

In its second issue, Richmond Condominiums argues that the trial court erred by not sanctioning opposing counsel for contacting the Richmond Condominium joint venturers during the litigation without the presence of Richmond Condominiums’ counsel.

A. Background

After the fire, the joint venture made a claim on its insurance policy, and Western
 
Heritage paid $938,189.72 to the joint venture.  As one of the conditions of receiving the insurance proceeds, each joint venturer contractually agreed to assist Western Heritage in any subsequent  suit against a responsible party.  Thereafter, Richmond Condominiums sued Skipworth for negligence; Skipworth answered the suit and then filed a counterclaim against the joint venture.
(footnote: 8)  

Richmond Condominiums contends that even though Skipworth knew the joint venture to be represented by counsel, in the months leading up to trial, Skipworth’s lawyers repeatedly contacted the members of the joint venture directly, without ever notifying counsel for Richmond Condominiums.  In particular, counsel for Skipworth allegedly sought to have joint venturers Priester, Scott, and Wachsman sign affidavits stating that Skipworth was not at fault, that the suit was meritless, and that counsel for the Richmond Condominiums joint venture had no authority to bring the instant action.  When Richmond Condominiums became aware of Skipworth’s counsel’s actions, it filed a motion requesting “monetary sanctions, for an order striking all of [Skipworth’s] pleadings, prohibiting them from putting on any witnesses, or any evidence, in the alternative, prohibiting them from putting on any evidence or cross-examining those persons whom they unethically interviewed.” 

The evidentiary material attached to Richmond Condominiums’ motion included the following:

1. Unauthenticated correspondence from Richmond Condominiums’ counsel to Skipworth’s counsel insisting that contact with members of the joint venture is improper and demanding it be stopped.

2. Three pages from Skipworth’s supplemental disclosures, one of which is an unauthenticated letter from Scott stating that he did not knowingly give Western Heritage permission to sue Skipworth and that, in his opinion, “there is no way to point the blame at Skipworth Plumbing.”

3. A copy of the proof of loss in which all joint venturers authorized Western Heritage to sue any third party who may be liable in damages to Richmond Condominiums and pledged “full cooperation” in such action.

4. Affidavits from Richmond Condominiums’ attorneys asserting that they saw Skipworth’s attorneys talking to a representative of third-party defendant A-Bar Electric.  Skipworth nonsuited A-Bar Electric shortly thereafter.

5. An unsigned and unauthenticated copy of the Richmond Condominiums joint venture agreement.

At the pretrial hearing requesting sanctions on this matter, counsel for Skipworth addressed the court as follows:

In this case we’ve got Larry Scott and Steve Priester who both have the . . . opinion that Scott Skipworth did nothing wrong.  Now, realize, Judge, I’m also representing a member of this partnership.  So it was our understanding, given the testimony that had developed, that these gentlemen didn’t fall under the purview of the disciplinary rule.  
We contacted them
.  Subsequently, we spoke to Kerry Roach, and by the way, Larry Scott also had spoken to Kerry Roach.  Mr. Roach informed us that Larry Scott was not going to have any problem giving us whatever we wanted, 
and he
 [Larry Scott] 
did, and he told us he didn’t think Mr. Skipworth did anything wrong
.  And then he told us that Mr. Priester was not going to take a position on the authority issue, but he is of the opinion that Mr. Skipworth also did nothing wrong in this case.  

Now, Judge, we believe the testimony that’s going to come from the witnesses in this case, including Mr. Forcher and Mr. Wachsman, is that Mr. Skipworth -- they’re not aware of anything Mr. Skipworth did wrong.  Now, they are going to say we believe, based on what we’ve been told, that the fire started because of Mr. Skipworth. . . . 
But there’s nothing in the rules of disciplinary conduct that prevents us from contacting somebody that has no managerial responsibility in a defunct company. 
 Whether they have a contract with them or not and whether they think those people have breached the contract or not, it’s simply they can take up on their own.  
But we fully intend to call both Mr. Priester and Mr. Scott to testify that they were members of this partnership when it was in existence.  Based on what they know, they don’t believe that Scott Skipworth or his company did anything wrong to start this fire. 
 
[Emphasis added.]  

The court denied Richmond Condominiums any relief.  Furthermore, the court permitted the joint venturers to testify at trial that, in their opinion, Skipworth was not negligent, that Skipworth did not cause the fire, and that they did not want the suit against Skipworth to be prosecuted
.
 
 Apparently, the court reasoned that even though the joint venture had never been formally dissolved, it had ceased doing business simply because the building had burned; therefore, the members were no longer in managerial positions and were fair game for ex parte contact.

B. Standard of Review

An appellate court reviews a trial court’s ruling on a motion for sanctions for an abuse of discretion.
(footnote: 9)  
Cire v. Cummings
, 134 S.W.3d 835, 838 (Tex. 2004).  The abuse of discretion standard requires us to determine whether the trial court “acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary and unreasonable.”  
Prevost v. Ins. Advisors of Tex., Inc
., 46 S.W.3d 289, 292 (Tex. App.—Fort Worth 2001, pet. denied). 
 Merely because an appellate court would in a similar circumstance decide the matter differently does not demonstrate that an abuse of discretion has occurred.  
Id
.

C. Application

As shown above, it is abundantly clear that counsel for Skipworth had been in direct contact with the joint venturers.  Texas Disciplinary Rule of Professional Conduct 4.02 reads,

In representing a client, a lawyer shall not communicate or cause or encourage another to communicate about the subject of the representation with a person, organization or entity of government the lawyer knows to be represented by another lawyer regarding that subject, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

Tex. Disciplinary R. Prof’l Conduct 4.02
(a)
.

At the time of these contacts, Skipworth had a counterclaim against the joint venture.  Further, according to the joint venture agreement, each joint venturer was exposed to potential liability as a result of the counterclaim,
 and the joint venturers who testified at trial did so as managerial agents of Richmond Condominiums.  Thus, it is clear that each joint venturer was a party to the lawsuit.

Furthermore, each of the joint venturers had also signed the “Sworn Statement in Proof of Loss,” which reads as follows:

The insured [Richmond Condominiums] hereby covenants that no release has been or will be given to or settlement or compromise made with any third party who may be liable in damages to the insured and the insured in consideration of the payment made under this policy hereby subrogates the said Company [Western Heritage] to all rights and causes of action the said insured has against any person, persons or corporations whomsoever for damage arising out of or incident to said loss or damage to said property and authorizes said Company to sue in the name of the insured but at the cost of the Company any such third party, 
pledging full cooperation 
in such action.  [Emphasis added.]  

We hold that under the plain language of this contract, the individual joint venturers as well as Richmond Condominiums, as the insured joint venture, were the same party as Western Heritage for purposes of the suit against Skipworth.  Richmond Condominiums was represented by counsel, and, therefore, the joint venturers were also represented by counsel. 
 Accordingly, we hold that the trial court abused its discretion to the extent that it based its decision not to impose sanctions on its conclusion that the joint venture no longer existed.

In its motion to the trial court, Richmond Condominiums based its request for sanctions solely on its contention that Skipworth violated disciplinary rule 4.02, but the thrust of its complaint relates to Skipworth’s conduct in the discovery process by improperly contacting party-witnesses.  Under rule 215.3 of the rules of civil procedure, if the trial court finds that a party is abusing the discovery process in seeking discovery, then it may, after notice and hearing, impose any appropriate sanction authorized by the rule.
(footnote: 10)  
Tex. R. Civ. P.
 215.3.  We hold that the ex parte contacts of Skipworth’s counsel with the represented opposing parties, in apparent violation of the disciplinary rules, constitute an abuse of the discovery process.  Therefore, the trial court’s unreasonable failure to impose sanctions for this conduct was an abuse of discretion.  
See Prevost
, 46 S.W.3d at 292.  

Richmond Condominiums urges us on rehearing to reverse and render a monetary sanctions award as well as to reverse and remand for a new trial without the “tainted witnesses.”  However, we may reverse only if the trial court’s failure to impose sanctions 
probably caused rendition of an improper judgment or probably prevented the appellant from properly presenting the case to this court.  
See
 T
EX
. R. A
PP
. P. 44.1(a); 
Romero v. KPH Consol.
,
 Inc.
, 166 S.W.3d 212, 220 (Tex. 2005).
  Furthermore, the choice of sanctions is within the sound discretion of the trial court, subject only to the requirement that the sanctions must be “just.”  
TransAmerican Nat. Gas Corp. v. Powell
, 811 S.W.2d 913, 917 (Tex. 1991) (orig. proceeding).  Whether sanctions are just is determined by a two-part process.  
Id.
  First, there must be a direct relationship between the offensive conduct and the sanction imposed, which requires a trial court to at least attempt to determine whether the offensive conduct is attributable to counsel only, or to the party only, or to both.  
Id. 
 Second, the sanction must not be excessive.  
Id.
  

Under the first 
TransAmerican
 prong, the sanction should be visited upon the offender.  
Id.
  On the one hand, a lawyer cannot shield his client from sanctions; a party must bear some responsibility for its counsel’s discovery abuses when it is or should be aware of counsel’s conduct and the violation of discovery rules.  
Id.
  On the other hand, a party should not be punished for counsel’s conduct in which it is not implicated apart from having entrusted to counsel its legal representation.  
Id.
 

Richmond Condominiums points us to nothing in the record showing that these ex parte contacts were anything other than the actions of Skipworth’s counsel alone.  Nothing in the record suggests that Skipworth directed, approved, or was even aware of its counsel’s unethical actions.  Because “a party should not be punished for counsel’s conduct in which it is not implicated apart from having entrusted to counsel its legal representation,” 
id.
, any sanction that punished Skipworth would have been impermissible
.
  Accordingly, on this record, the only sanctions that would have been appropriate would have been those assessed against Skipworth’s counsel; any evidentiary sanction affecting Skipworth’s ability to develop its defense at trial—such as striking the allegedly “tainted witnesses”—would have been unfair and improper because it would have punished Skipworth for a transgression that it did not commit and for which it bore no responsibility.  
See id.
  

Richmond Condominiums cites 
Schenck v. Ebby Halliday Real Estate, Inc.
, 803 S.W.2d 361 (Tex. App.—Fort Worth 1990, no writ), to argue that evidence “tainted by unethical or unlawful conduct” should be excluded.  In 
Schenck
, we affirmed the trial court’s exclusion of an expert witness’s testimony because the expert for Ebby Halliday, in violation of the rules of civil procedure, had trespassed upon Schenck’s property to gather information to formulate his expert opinion.  
Schenck 
is a pre-
TransAmerican
 case, however, so it does not even attempt to determine whether Ebby Halliday bore any responsibility for the expert’s offensive conduct or consider whether Ebby Halliday was actually being punished for the wrongdoing of its expert’s conduct alone.  

Furthermore, in 
Schenck
, the testimony that was excluded stemmed directly from the expert’s improper conduct—that is, the expert’s opinion was directly formulated from the information wrongfully obtained by his trespass on the Schencks’ property.  Here, in contrast, the record does not show that the content of the joint venturers’ testimony was necessarily a direct result of their contact with Skipworth’s counsel.  Even though the joint venturers testified at trial that they thought Skipworth did not cause the fire and that they did not want Skipworth to be prosecuted, there is no evidence that Skipworth’s counsel actually induced them to so testify, or that they would have testified differently had Skipworth’s counsel not contacted them.
(footnote: 11)  Therefore, although Skipworth’s counsel’s conduct apparently violated the disciplinary rules, the record does not affirmatively link the content of the joint venturers’ testimony at trial to this violation.  Accordingly, 
Schenck
 does not mandate a conclusion that the joint venturers’ testimony must automatically be excluded.

Because we hold that, 
on this record
, an appropriate sanction for the unethical conduct of Skipworth’s counsel could not have been assessed against Skipworth itself and could not have affected the evidence presented at trial, the trial court’s abuse of discretion did not cause the rendition of an improper judgment or prevent Richmond Condominiums from properly presenting its appeal.  Therefore, it does not warrant reversal.  
See 
Tex. R. App. P.
 44.1(a).
(footnote: 12)  We overrule Richmond Condominiums’ second issue.  

V. Other Alleged Errors

In its third issue, Richmond Condominiums argues that the trial court committed reversible error by (1) forcing Richmond Condominiums to present evidence of insurance to the jury and (2) admitting speculative testimony from nonexperts in violation of the court’s limine order and over Richmond Condominiums’ objections.  We shall discuss each assertion in turn.    

A. Evidence of Insurance 

Richmond Condominiums argues that Skipworth’s examination of the joint venturers improperly forced Richmond Condominiums to interject insurance into the case.  We disagree. 

1. Background 

During the pretrial proceedings, Richmond Condominiums initially advised the trial court that it wished to introduce the “proof of loss” and Richmond Condominiums’ insurance policy into evidence, but it wanted to avoid publishing them to the jury.  Skipworth disagreed as to the relevance of the proof of loss, but it offered to stipulate that Richmond Condominiums was entitled to bring its subrogation claim for the amount it had paid under its policy.  Richmond Condominiums’ counsel insisted, however, that he was entitled to use the proof of loss in his cross-examination of Scott Skipworth—“It’s a sworn statement by Mr. Skipworth.  And I’ll have to cross-examine him about it.”

Based on Richmond Condominiums’ insistence that it would cross-examine Scott Skipworth with the proof of loss, the trial court noted that Richmond Condominiums was introducing the document for all purposes and said, “just got through saying that you’re going to have to use that to -- with the gentleman to prove up and there’s an admission by him, then you’re injecting insurance into the case.”  Ultimately, Richmond Condominiums’ counsel conceded that he could not have it both ways and stated,  

I’m not certain how we’ll deal with it, but I just wanted to bring it to the Court’s attention because I’ve in [sic] been in positions before like this where I’ve come in and I’ve used an insurance document for noninsurance purpose and smarter for it [sic].  So I just wanted to alert the Court to that kind of in advance.

During opening argument, Richmond Condominiums told the jury that it had spent $938,198.72 on the project at the time of the fire, which was the amount stated on the proof of loss that Richmond Condominiums submitted to Western Heritage.  Forcher then testified that approximately $930,000 had been put into the project at the time of the fire.  Richmond Condominiums sought to bolster Forcher’s testimony by introducing invoices, but it ultimately abandoned the effort.  Richmond Condominiums then sought unsuccessfully to have Forcher testify as to the appraised value of the project and what the eventual value of the project would have been.

Richmond Condominiums then chose to offer the proof of loss as evidence of its damages.  Based on Richmond Condominiums’ offer, the proof of loss was admitted into evidence without limitation over Skipworth’s objection.  According to Richmond Condominiums, the proof of loss represented the amount that “Mr. Skipworth admits the actual cash value of this property [was at] the time of its loss[.]”  Prior to its cross-examination of Forcher, Skipworth sought clarification as to the use of the proof of loss to demonstrate that Skipworth was not responsible for the fire.  The trial court allowed the proof of loss to be used in conjunction with the cross-examination of Forcher.

Scott then testified, without objection, that he had no criticism of Skipworth and was aware of no evidence that Skipworth’s negligence caused the fire at issue.  Moreover, Scott testified that he had no personal desire to sue Skipworth for causing the fire.  In response, Richmond Condominiums’ counsel presented the proof of loss to Scott and elected to ask Scott why he signed it. In response to Richmond Condominiums’ direct question, Scott said, “I was under the impression that the insurance company was paying the -- making their payment to the corporation for the damages, and I was told that I needed to come up and sign that document, you know, because the loan was being paid off.”

Skipworth again sought clarification as to the extent to which the proof of loss could be used in cross-examination in light of Richmond Condominiums’ introduction and use of same.  The trial court noted that Richmond Condominiums had brought the proof of loss into focus:  “Well, the door has definitely been opened.  And I mean[,] . . . [y]ou opened it up . . . you knew what the document was . . . [. Y]ou asked him the meaning of it.”

After Skipworth examined Scott regarding the proof of loss, Richmond Condominiums again returned to its questioning of Scott’s motivation and intent with respect to insurance.  Indeed, Richmond Condominiums carefully examined Scott as to the particular meaning of the exact language found in the proof of loss.  During Skipworth’s case in-chief, Wachsman was called by deposition.
(footnote: 13) When asked if he would have signed the proof of loss had he known Richmond Condominiums was going to sue Skipworth, Wachsman testified, “I don’t think I would’ve.”  Richmond Condominiums then proceeded to offer additional testimony by Wachsman regarding the proof of loss and Richmond Condominiums’ coverage for the loss.

2. Analysis  

A review of the trial proceedings reveals that Richmond Condominiums apparently did not enter the proof of loss into evidence to establish evidence of damages
 in response to any questioning by Skipworth.  Only 
after
 Richmond Condominiums got the proof of loss admitted did Skipworth ask the joint venturers the questions that allegedly forced Richmond Condominiums to present evidence of insurance to the jury.  Furthermore, the proof of loss was admitted
 without limitation
.  Evidence admitted without limitation comes into evidence for any and all purposes. 
 Gabriel v. Lovewell
, 164 S.W.3d 835, 845 (Tex. App.—Texarkana 2005, no pet.).  In the absence of a request for such a limitation, “the court’s action in admitting such evidence without limitation shall not be a ground for complaint on appeal.”  
Tex. R. Evid.
 105(a).  Therefore, we hold that Richmond Condominiums’ contention that the trial court erred by forcing it to present evidence of insurance to the jury is without merit.  Accordingly, we overrule this portion of Richmond Condominiums’ third issue.   
B. Admitted Testimony

In this part of its third issue, Richmond Condominiums asserts that the trial court erred by allowing the testimony of the joint venturers concerning Skipworth’s liability for the fire, which amounted to nothing more than speculation from nonexperts.  
 

1. Standard of Review 

A trial court’s rulings in admitting or excluding evidence are reviewable under an abuse of discretion standard.  
Nat’l Liab. & Fire Ins. Co. v. Allen
, 15 S.W.3d 525, 527 (Tex. 2000).  To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable.  
Downer v. Aquamarine Operators, Inc.
, 701 S.W.2d 238, 241–42 (Tex. 1985), 
cert. denied
, 476 U.S. 1159 (1986).  Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred.  
Id
.

An abuse of discretion does not occur when the trial court bases its decisions on conflicting evidence.  
In re Barber
, 982 S.W.2d 364, 365 (Tex. 1998) (orig. proceeding).  Furthermore, an abuse of discretion does not occur as long as some evidence of substantive and probative character exists to support the trial court’s decision.  
Butnaru v. Ford Motor Co.
, 84 S.W.3d 198, 211 (Tex. 2002).

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if they are not apparent from the context of the request, objection, or motion.  
Tex. R. App. P.
 33.1(a); 
see also 
Tex. R. Evid.
 103(a)(1).  If a party fails to do this, error is not preserved, and the complaint is waived.
  Bushell v. Dean
, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh’g).  The objecting party must get a ruling from the trial court.  This ruling can be either express or implied.  
Residential Dynamics v. Loveless
, 186 S.W.3d 192, 195 (Tex. App.—Fort Worth 2006, no pet.).

2. Application 

Richmond Condominiums first argues that its motion in limine preserved error.  However, a trial court’s ruling on a motion in limine preserves nothing for review; a party must object at trial when the testimony is offered in order to preserve error for appellate review.  
Hartford Accident & Indem. Co. v. McCardell
, 369 S.W.2d 331, 335 (Tex. 1963); 
Greenberg Traurig of N.Y., P.C. v. Moody
, 161 S.W.3d 56, 91 (Tex. App.—Houston [14th Dist.] 2004, no pet.).  Therefore, Richmond Condominiums was required to lodge a proper objection to any testimony that it felt was being admitted in error.

On cross-examination Skipworth asked Wachsman, “You don’t have any evidence to show this jury that my client [Skipworth] was negligent in any way causing this fire?”  Richmond Condominiums promptly objected.  However, after Skipworth explained its reasoning, the trial court asked, “[I]sn’t that a subject for cross-examination?”  Richmond Condominiums replied, “Okay.” Thus, although Richmond Condominiums made a timely objection, it failed to get a ruling on that objection.  Accordingly, any complaint relating to this question was not preserved for our review.

Richmond Condominiums did properly preserve other questions asked by Skipworth of the joint venturers.  Priester was asked, “Do you have any criticism of the work that Skipworth Plumbing did at Richmond Condominiums?” and whether he “personally ha[d] no desire to recover or sue Mr. Skipworth.”  Richmond Condominiums objected to the questions as lacking foundation and on relevancy grounds, respectively.  The trial court overruled Richmond Condominiums’ objection on both grounds.  Priester then answered no to both questions.  Scott too was asked whether he had any “desire to sue or recover anything from Skipworth Commercial Plumbing.”  Again, Richmond Condominiums objected and was overruled.  Scott also answered no to the question.  

Likewise, Wachsman was asked whether he was “seeking anything individually from Mr. Skipworth or his plumbing company in this case.”  Lastly, Skipworth was allowed to read Wachsman’s deposition into evidence over Richmond Condominiums’ running relevancy objection.  Wachsman’s deposition testimony related to his disagreement with Richmond Condominiums’ decision to sue Skipworth and Wachsman’s claim that he would not have signed the proof of loss had he known that Skipworth would be sued.

We agree with Richmond Condominiums that a proper foundation had not been laid to qualify Priester to testify whether he had any criticism of Skipworth’s plumbing work.  A witness is qualified to testify as an expert if he has the appropriate knowledge, skill, experience, training, or education.  
Tex. R. Evid. 
702; 
Roberts v. Williamson
, 111 S.W.3d 113, 120–21 (Tex. 2003).
  There was no testimony or other evidence presented that qualified Priester to testify to the adequacy of Skipworth’s plumbing work.  Priester’s and Scott’s testimony that they had no personal desire to recover from Skipworth was irrelevant. Likewise, Wachsman’s testimony that he was not individually seeking to recover anything from Skipworth was also irrelevant.  None of that testimony even remotely related to whether Skipworth was liable for the fire.  
See
 
Tex. R. Evid.
 401 (defining “relevant evidence” as that with any tendency to make consequential facts more or less probable).  Moreover, whether Wachsman agreed with the decision to sue Skipworth or whether he would have signed the proof of loss had he known Skipworth would be sued is also irrelevant.
  Thus, it was error for the trial court to allow this testimony.  
See 
Tex. R. Evid.
 
402 (stating that evidence which is not relevant is inadmissible). 

We hold that the trial court acted without reference to any guiding rules or principles and therefore acted arbitrarily and unreasonably.  
See Downer
, 701 S.W.2d at 241–42.  Having found error, we must now assess whether those errors were harmful.  

3. Harm Analysis

We will not reverse a trial court’s judgment because of an erroneous evidentiary ruling unless the ruling probably caused the rendition of an improper judgment.  
Horizon/CMS Healthcare Corp. v. Auld
, 34 S.W.3d 887, 906 (Tex. 2000); 
Owens-Corning Fiberglas Corp. v. Malone
, 972 S.W.2d 35, 43 (Tex. 1998); 
see also
 
Tex. R. App. P.
 44.1(a); 
Romero
, 166 S.W.3d at 220.  The complaining party must usually show that the whole case turned on the evidence at issue.  
City of Brownsville v. Alvarado
, 897 S.W.2d 750, 753–54 (Tex. 1995).  We examine the entire record in making this determination of harm.  
Interstate Northborough P’ship v. State
, 66 S.W.3d 213, 220 (Tex. 2001).

As we held above, Richmond Condominiums has shown that errors occurred.  However, after examining the entire record, we are unable to say that the errors probably caused the rendition of an improper verdict or that the errors prevented Richmond Condominiums from presenting its case to the court.  
See
 T
EX
. R. A
PP
. P. 44.1(a); 
Romero
, 166 S.W.3d at 220.  As detailed throughout this opinion, there was a wealth of conflicting lay and expert testimony and evidence presented at trial by both parties.  In that context, the above improperly admitted testimony was but a fraction of the overall evidentiary picture that was before the jury.  We hold that even if the above testimony had been excluded, it would probably not have changed the outcome of the whole case.  Therefore, Richmond Condominiums cannot show that the whole case turned on the evidence at issue.  
See
 
Alvarado
, 897 S.W.2d at 753–54.  Accordingly, we overrule this portion of Richmond Condominiums’ third issue.   
  

VI. Jury Argument

In its fourth issue, Richmond Condominiums contends that Skipworth made improper jury arguments during closing arguments that were so inflammatory that they were incurable and constitute reversible error.  Again, we disagree.

A. Background 

In order to analyze the propriety of Skipworth’s closing argument, we must first review Richmond Condominiums’ preceding closing argument.  The relevant portion of Richmond Condominiums’ argument was as follows: 

[T]he amount.  Mr. Forcher said two and a half million dollars.  The son-in-law, Mr. Wachsman, probably the funniest man I’ve ever seen on the witness stand, said that if it was finished, more likely in his experience, it would be $1,500,000.  We know they had put $950,000 put into the building.  I would suggest to you that’s the cost, the cost is simply different from fair market value.  

What is the market value of the building the moment it burned? $1,500,000.  The market value afterwards, zero.  
So $1,500,000 is the number to put in here
.  

The fact that there’s 
insurance
 in this case . . . is irrelevant.  Each day we all stood here and pledged allegiance to the flag.  Remember the last phrase of that pledge, “liberty and justice for all.”  Just 
because you’re an insurance company 
doesn’t mean you’re not entitled to justice.  I can tell you the fact that this was 
partially insured 
shouldn’t play any part in your deliberation.  
[Emphasis supplied.]  

The portion of Skipworth’s closing argument that Richmond Condominiums complains of was as follows:

Now, Ladies and Gentlemen, let’s make something real clear.  The people suing in this case are Western Heritage Insurance Company, the company that got premiums from this joint venture to issue a builder’s risk policy to insure for accidents that would occur on the property.  That’s why we’re here.  That’s why Mr. Forcher isn’t here.  That’s why Mr. Wachsman and Mr. Scott and Mr. Priester all took this witness stand and said he [Skipworth] did nothing wrong.  The reason we’re here is because this insurance company took premiums to insure a risk, the building burned and now they want to profit from it.  

You heard him say the number should be a million-five.  But they only paid $938,000 on this thing.  Now, they want to make money on this. . . . 

What we have here is an insurance company that doesn’t want to live up to their obligation, an insurance company who issued a policy to cover accidents.  And that’s what we have here.  No one in this case can deny the fact that accidents happen. . . .  

B. Standard of Review 
  

Control of counsel’s conduct during jury argument rests in the sound discretion of the trial court.  
Wells v. HCA Health Servs. of Tex., Inc.
, 806 S.W.2d 850, 854 (Tex. App.—Fort Worth 1990, writ denied); 
see also
 
Tex. R. Civ. P. 
269.  The test for improper jury argument is whether the argument could have persuaded a juror of ordinary intelligence to agree to a verdict contrary to that to which he would have agreed but for the argument.  
See Welch v. McLean
, 191 S.W.3d 147, 161 (Tex. App.—Fort Worth 2005, no pet.) (op. on reh’g).  
Reversal is required only when the entire record shows that argument was improper, uninvited and unprovoked, preserved by a timely objection, and incurable by instruction, withdrawal, or trial court reprimand.  
See Standard Fire Ins. Co. v. Reese
, 584 S.W.2d 835, 839 (Tex. 1979); 
Welch
, 191 S.W.3d at 161.  Further, an appellant must show that the argument constituted harmful error by its nature, degree, and extent.  
Standard Fire
, 584 S.W.2d at 839.  The party seeking reversal based on an allegedly improper argument must show that the probability that the improper argument caused harm is greater than the probability that the verdict was grounded on the proper proceedings and evidence.  
Id. 
at 840.

C. Application

The areas of Skipworth’s closing argument that Richmond Condominiums complains of can be categorized into three general areas:  (1) references related to insurance, (2) the claim that Western Heritage was attempting make a profit in the case, and (3) the reference to the joint venturers’ testimony that Skipworth “did nothing wrong.”   

A review of the closing arguments reveals that it was Richmond Condominiums, not Skipworth, who first referenced the involvement of insurance and the fact that the party suing in the name of Richmond Condominiums was really an insurance company.  Likewise, it is plain from the words, “
$1,500,000 is the number you put in here,” that 
Richmond Condominiums did in fact initially ask the jury to award it $1,500,000.  No authority holds that Skipworth was required to sit on its hands and not respond to Richmond Condominiums’ arguments.  As it relates to these two areas, Skipworth’s arguments were in response to and confined to the arguments of opposing counsel in compliance with rule 269.  
See
 
Tex. R. Civ. P.
 269(e).  Because Skipworth’s arguments in these two areas were invited and provoked, we cannot hold that they were improper.  
See
 
Welch
, 191 S.W.3d at 161. 

The last area of contention relates to Skipworth’s referencing the testimony of the joint venturers that Skipworth “did nothing wrong.”  Although this argument may have been improper, we cannot say that it was 
incurable by instruction, withdrawal, or trial court reprimand.  
See
 
Standard Fire
, 584 S.W.2d at 839.  Moreover, there was considerable evidence in favor of the jury’s verdict.  Thus, we 
do not believe this 
argument could have persuaded a juror of ordinary intelligence to agree to a verdict contrary to that to which he would have agreed but for the argument. 
 See Welch
, 191 S.W.3d at 161.  Therefore, Richmond Condominiums has failed to show that the probability that the improper argument caused harm is greater than the probability that the verdict was grounded on the proper proceedings and evidence.
  See Standard Fire
, 584 S.W.2d at 839. 
 
 
 

Accordingly, we overrule Richmond Condominiums’ final issue.

VII. Conclusion 

Having overruled Richmond Condominiums’ four issues, we affirm the trial court’s judgment.                 

BOB MCCOY

JUSTICE

PANEL B: LIVINGSTON, WALKER, and MCCOY, JJ.

WALKER, J. concurs without opinion.

DELIVERED: February 7, 2008

  

  

 

 

  

FOOTNOTES
1:
Because of the subgrogation agreement, we shall refer to the Appellant as both “Western Heritage” and “Richmond Condominiums,” depending on the context of our discussion.  

2:
Forcher’s trial testimony regarding the presence of the painters varied from his deposition testimony wherein he testified that the painters were not present on the day of the fire.

3:
The hydraulic fluid was moved to this location by Forcher.  

4:
Henderson subsequently graduated from the Wichita Falls Fire Academy.

5:
Graham assumed his current position in May 1999 and has investigated more than four hundred fires.  His background and qualifications include ten years in the United States Navy as an electrician on a nuclear submarine, four and one-half years as a Deputy Sheriff of Kitsap County, Washington handling criminal investigations, and tenure as a Wichita County Deputy Sheriff.  He holds an associate’s degree from Olympic College and a bachelor’s degree in applied arts and sciences from Midwestern State University, and he was enrolled as a graduate student in the criminal justice program at Midwestern State University. Graham is also a certified police officer and certified arson investigator. 
 This 
latter certification requires completing a 128-hour course through a fire investigation academy and passing a certification exam administered by the Texas Commission of Fire Protection.

6:
Graham testified that fire investigation standards provide that when there is evidence that points to one cause, that is the conclusion you reach; however, here, there was no such evidence.  In this instance, he could not say that one cause was more likely than another.

7:
Graham stated, as “far as cause, whether or not it was intentionally set, I don’t have to go into any of that, because it is quite frankly very possible this fire was intentionally set, and that is one of the possible causes.”

8:
Skipworth nonsuited this counterclaim shortly before trial.

9:
It appears that this standard of review is applicable whether the appellate court is reviewing the imposition of sanctions (which is almost always the case) or a decision not to impose sanctions.
 
 
See Johnson v. Davis
, 178 S.W.3d 230, 242 (Tex. App—Houston [14th Dist.] 2005, pet. denied); 
In re C.Z.B.
, 151 S.W.3d 627, 636 (Tex. App.—San Antonio 2004, no pet.); 
Whitaker v. Bank of El Paso
, 850 S.W.2d 757, 762 (Tex. App.—El Paso 1993, no writ);
 Home Owners Funding Corp. of Am. v. Scheppler
, 815 S.W.2d 884, 889 (Tex. App.—Corpus Christi 1991, no writ).

10:
These authorized sanctions range from merely assessing discovery costs against the disobedient party to the more serious “death penalty” sanction of striking a disobedient party’s pleadings and rendering a default judgment against the party.  
See
 
Tex. R. Civ. P.
 215.2(b)(1), (2), (3), (4), (5), (8).

11:
While the proof of loss signed by the joint venturers did authorize Western Heritage to sue responsible third parties and did pledge the joint venturers’ full cooperation in such a lawsuit, it did not address the issue of whether the joint venturers thought that Skipworth was responsible for the fire.

12:
Richmond Condominiums also urges us to reverse and render monetary sanctions, but it does not point to any evidence in the record as to monetary harm that would support the imposition of monetary sanctions against the attorneys in any particular amount.  Accordingly, on the record before us, we cannot say that the trial court abused its discretion by deciding not to impose monetary sanctions.  
See TransAmerican
, 811 S.W.2d at 913 (stating that the choice of sanctions is within the sound discretion of the trial court).

13:
Richmond Condominiums objected to the reading of Wachsman’s deposition testimony based on relevance.  The trial court overruled this objection.