# NO. 12-19-00384-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *THURSTON, OWENS & NEWMAN, L.L.C., D/B/A SOUTHWEST RESTAURANT & BEVERAGE SOLUTIONS, APPELLANTS/CROSS-APPELLEES, APPELLANTS* | § | *APPEAL FROM THE* |
| *V.* | | |
| *JERRY DAVIS, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF HAYDEN DAVIS, KAREN DAVIS, AND SUMMER HERNANDEZ, AS NEXT FRIEND OF G.L.D. AND C.N.D., APPELLEES/CROSS-APPELLANTS,* | § | *COUNTY COURT AT LAW NO. 2* |
| *APPELLEES* | § | *GREGG COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Thurston, Owens & Newman, LLC d/b/a/ Southwest Restaurant & Beverage Solutions (Southwest) appeals the trial court's amended judgment and award rendered in favor of Appellee Jerry Davis, both individually and as personal representative of the Estate of Hayden Davis, Karen Davis, and Summer Hernandez and as next friend of G.L.D. and C.N.D. Southwest raises four issues on appeal; Davis raises two cross points. We reverse and modify in part, suggest remittitur, and affirm as modified in part.

## BACKGROUND

Hayden Davis worked as an apprentice electrician for Gill Electric. On September 27, 2017, Hayden was working near a refrigeration unit located at a business in White Oak, Texas, which was owned by Southwest. Unbeknownst to Hayden, the unit previously had been wired

incorrectly by Southwest, whose employee connected a "hot" wire to a ground lug, in an attempt to keep the equipment running. While working near the unit, Hayden was electrocuted. At the time of his death, Hayden was twenty-four years old and had two young daughters.

Davis filed suit for wrongful death. Southwest answered, asserted the negligence of others as an affirmative defense, and, later, named Gill Electric as a responsible third party. At the conclusion of trial, the jury found that the negligence of Southwest (40%), Gill Electric (40%), and Hayden Davis (20%) were the proximate causes of Hayden's death and, in pertinent part, awarded damages for future pecuniary loss in the amount of $1,000,000.00 to Hayden's daughter, Calli Davis, and $750,000.00 to his daughter, Grace Davis.

Southwest filed a motion for remittitur with regard to the jury's award for future pecuniary loss. The court suggested a remitter of $425,000.00 to Calli Davis and $475,000.00 to Grace Davis, to which Davis consented. The trial court signed an amended final judgment, which reflected the lower awards, and this appeal and cross appeal followed.

FACTUAL SUFFICIENCY – FUTURE PECUNIARY LOSS

In its first issue, Southwest argues that the evidence supporting the award after remittitur for future pecuniary loss is against the great weight and preponderance of the evidence. In his first cross point, Davis argues that the trial court abused its discretion in suggesting remittitur of the award for future pecuniary loss because the evidence is insufficient to support the suggestion of remittitur.[1]

**Standard of Review and Governing Law**

Whether damages awarded are excessive or whether a trial court should have ordered a remittitur is reviewed for factual sufficiency. *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex.1998); *Rose v. Doctors Hosp.*, 801 S.W.2d 841, 847 (Tex. 1990). When the complaining party has the burden of proof and the factfinder returns an adverse finding, the complaining party must challenge the finding on the basis that it proved the issue as a matter of law or that the jury's answer is against the great weight and preponderance of the evidence. *See Lott v. Brown*, No. 12-17-00093-CV, 2018 WL 6191301, at *2 n.3 (Tex. App.–Tyler Nov. 28,

---

[1] "If a party makes the remittitur at the trial judge's suggestion and the party benefitting from the remittitur appeals, the remitting party is not barred from contending in the court of appeals that all or part of the remittitur should not have been required, but the remitting party must perfect an appeal to raise that point. If the court of appeals sustains the remitting party's contention that remittitur should not have been required, the court must render the judgment that the trial court should have rendered." TEX. R. APP. P. 46.2.

2

2018), *supplemented*, 2018 WL 6287920 (Tex. App.–Tyler Dec. 3, 2018, no pet.) (mem. op.). However, if the complaining party did not have the burden of proof, it must challenge an adverse finding by arguing that there is no evidence or insufficient evidence to support the finding. *See id.*

Factual sufficiency challenges require courts of appeals to weigh all the evidence in the record. *See Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). However, in reviewing a finding under the "great weight and preponderance of the evidence" standard, we first must look to the record to determine whether some evidence exists in support of the finding. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241–42 (Tex. 2001). If such evidentiary support exists, we then consider whether any evidence contrary to that finding exists, and if it does, we will determine whether, based on the evidence in the record, the finding is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust, or if the great preponderance of the evidence supports the nonexistence of that finding. *See Pearl Res. LLC v. Charger Svcs, LLC*, No. 08-19-00096-CV, 2020 WL 4251373, at *5 (Tex. App.–El Paso Jul. 24, 2020, pet. filed) (op.) (citing *Castillo v. U.S. Fire Ins. Co.*, 953 S.W.2d 470, 473 (Tex. App.–El Paso 1997, no writ)).

The court's charge defined "pecuniary loss" as "the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value that Calli Davis and Grace Davis, in reasonable probability, would have received from Hayden Davis had he lived." *See Moore v. Lillebo*, 722 S.W.2d 683, 687 (Tex. 1986). Southwest did not object to this definition. We, therefore, measure the sufficiency of the evidence against the charge as given. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000).[2]

"Pecuniary loss in a wrongful death case is not subject to a precise mathematical calculation, and the jury is given significant discretion in determining this element of damages." *Christus Health v. Dorriety*, 345 S.W.3d 104, 113 (Tex. App.–Houston [14th Dist.] 2011, pet. denied). Pecuniary losses may be recovered even in the absence of specific evidence of the amount of contributions the decedent made before his death or that he would have continued to make in the future. *Id.*; *see also Badall v. Durgapersad*, 434 S.W.3d 626, 638 (Tex. App.–

---

[2] In its brief, Southwest argues that the projection into the future of Hayden's past earnings is the "primary element" to be used in determining future pecuniary loss. However, since Southwest failed to object to the "pecuniary loss" definition in the court's charge, we will not weigh this component more heavily in our analysis. *See id.*

Houston [1st Dist.] 2014, pet. denied) (jurors may apply knowledge and experience to estimate value of services, such as household services, rendered by decedent without proof of value). Thus, a jury determining an award for pecuniary loss may look beyond evidence of calculable financial contributions. *See **Dorriety***, 345 S.W.3d at 113.

**Discussion**

In this case, the jury heard evidence that Hayden was a devoted father to two young girls, Calli, age five, and Grace, age three. Jerry Davis, Hayden's father, testified that Hayden cared for his daughters three to four days per week and spent a lot of time with them. He specified that Hayden woke up two hours before work to get his daughters ready in the morning and spent time with them from the time he finished work until they went to sleep at night. According to Jerry, Hayden's role in their lives was one of a cook, a sitter, and a chauffer. Additionally, Jerry described how Hayden took a great interest in their collective physical and emotional well-being, coordinated their activities and exercise, and encouraged and fostered a religious foundation for them. Jerry also described how Hayden regularly would engage in recreational activities with his girls. The jury reasonably could determine that such services might be provided, in Hayden's absence, by daycare, camps, or other recreational organizations. Jerry further described how Hayden provided the girls with food, clothing, transportation, housing, and daycare costs.

Furthermore, the jury was able to consider testimony about Hayden's relationship with his parents, who, the record reflects, provided support to Hayden in adulthood, which included their permitting him and his daughters to live with them, their planning to invest in his future by providing financial support to help him study to be a journeyman electrician, and their offering to provide seed money to him and his brother to start a business someday. Thus, the jury reasonably could have found that Hayden would have been inclined to provide financially for his daughters past their eighteenth birthdays.[3] For instance, Jerry testified that it was Hayden's dream for his daughters to go to college. As a result, the jury reasonably could have found that Hayden would want to offer financial support for his daughters' secondary educations.

In contrast, Southwest argues that despite this evidence of Hayden's devotion to his daughters, other evidence supports a conclusion that he lacked motivation, previously had endured academic struggles, and faced an uphill battle in passing the test to become a

---

[3] We note that the court's charge does not place any time limitations in its charge on what the jury can consider in determining an award for future pecuniary loss. *See **Osterberg***, 12 S.W.3d at 55.

journeyman electrician, much less that he likely would achieve his goal of becoming a master electrician. Thus, according to Southwest, despite Hayden's best intentions, his prospects for reaching an earning capacity to provide for his daughters at a level on par with the jury's future pecuniary loss award was not supported by the great weight and preponderance of the evidence. We disagree.

The jury also was able to consider Jerry's testimony about Hayden's passion for being an electrician along with his testimony that, prior to his death, Hayden had accumulated enough hours on the job as an apprentice electrician, which is a significant hurdle to be eligible to sit for the journeyman electrician exam. Moreover, the jury was able to consider Jerry's testimony about Hayden's academic struggles in conjunction with his observations about how Hayden was able to flourish when he moved to a charter school later in his high school years and, ultimately, graduated and spoke at his graduation. The jury was able to consider this testimony in conjunction with Jerry's testimony that he hired a consultant to help Hayden study for the journeyman exam. And although Southwest stresses the difficulty of this exam based on Gilbert Smith's testimony that it would be a difficult exam for him and most people fail the test at least once, the jury was entitled also to consider Smith's testimony that the test was "open book" and that for many people, the test is "not that hard." Furthermore, the jury was entitled to rely on Cody Gill's testimony that he expected Hayden to become a journeyman electrician and, eventually, a master electrician, as well as Gill's testimony that Hayden was a good employee, had the ambition to go further as an electrician, and, doubtlessly, could have done anything he set his mind to accomplish. Based on the entirety of the record, we conclude that the jury reasonably could have found that Hayden would, at least, have reached the level of journeyman electrician, which, considered in conjunction with evidence that Hayden had a life expectancy of an additional fifty-three years, would have provided ample income to account for the jury's award of future pecuniary loss.

We have considered the record in its entirety. In so doing, we are mindful that the jury is given significant discretion in determining this element of damages and may apply its collective knowledge and experience to estimate the value of services rendered by the decedent without proof of value. *Dorriety*, 345 S.W.3d at 117; *see also **Badall***, 434 S.W.3d at 638. Yet, in conducting our factual sufficiency analysis, we remain mindful that the future services potentially rendered by the decedent must have some evidentiary basis. *See **Dow Chem. Co.***, 46

S.W.3d at 241–42. And even though measuring pecuniary loss is inherently speculative and imprecise, the jury's discretion in this regard cannot include valuation for decedent-rendered services that are a product of unbridled speculation. *Cf. Pediatrics Cool Care v. Thompson*, No. 14-19-00031-CV, 2021 WL 307306, at *11 (Tex. App.–Houston [14th Dist.] Jan. 29, 20, no pet.) (citing *John Deere Co. v. May*, 773 S.W.2d 369, 379–80 (Tex. App.–Waco 1989, writ denied)).

Based on our review of the record, we conclude that there is ample evidence to support the award after remittitur for Calli's and Grace's future pecuniary loss in the following categories: (1) nonparental childcare including daycare, summer care, after school care, and after school pickup when after school care no longer is available; (2) monetary attribution for care provided by Hayden during the four days per week the girls are in his care; (3) child support payments;[4] (4) food for the four days per week the girls are in Hayden's care; (5) clothing; (6) transportation costs for the four days per week the girls are in Hayden's care, as well as the cost of moderately priced used cars when the girls are licensed to drive; (7) housing costs for the four days per week the girls are in Hayden's care; (8) healthcare out-of-pocket costs and premiums not paid by an employer, including physical care and mental health care; (9) college tuition, housing costs, and books for a four year college in Texas; (10) birthday and Christmas gifts; and (11) miscellaneous expenses, including things such as personal care items, entertainment, and reading materials. However, certain categories of future pecuniary loss for which Davis argues, such as music lessons, tutoring, vacations, orthodonture, weddings, and inheritance, were not properly considered because the likelihood and/or frequency of their respective occurrences lack even inferential evidentiary support and, in spite of the jury's significant discretion on the issue, are too speculative to form the basis of a future pecuniary loss determination.[5] Based on the foregoing, we hold that the evidentiary support for the award for future pecuniary loss after remittitur is not against the great weight and preponderance of the evidence. Southwest's first issue is overruled.

---

[4] There is evidence that despite the fact that he and his daughters' mother never were married, Hayden signed an agreement to pay child support.

[5] There is evidence in the record that supports Calli's potential need for further grief counseling. However, the definition of future pecuniary loss in the court's charge premised the potential award of "contributions of a pecuniary value that Calli Davis and Grace Davis, in reasonable probability, would have received from Hayden Davis had he lived." The evidence of record indicates that the sole reason underlying Calli's need for grief counseling was Hayden's death. Had he lived, Calli's need for grief counseling would be obviated.

Moreover, based on our review of the record and consideration of the evidence underlying the aforementioned categories on which a determination of future pecuniary loss could be based and comparing them with those without sufficient evidentiary foundation, we conclude that while the evidence supports an award to both Calli and Grace for future pecuniary loss in excess of the amount awarded after remittitur, the amount of the jury's awards for future pecuniary loss to Calli and Grace are against the great weigh and preponderance of the evidence. Therefore, we hold that the evidence is insufficient to support the amount of remittitur suggested by the trial court, even though a suggestion of remittitur itself was appropriate. Davis's first cross point is overruled.

## EXCLUSION OF EVIDENCE

In its second issue, Southwest argues that the trial court abused its discretion in excluding evidence related to Hayden's past marijuana use because such evidence was relevant to the issue of future pecuniary loss.

### Standard of Review and Governing Law

A trial court's evidentiary ruling is reviewed under an abuse of discretion standard. ***Owens-Corning Fiberglas Corp. v. Malone***, 972 S.W.2d 35, 43 (Tex. 1998); ***Bedford v. Moore***, 166 S.W.3d 454, 465 (Tex. App.–Fort Worth 2005, no pet.). A court abuses its discretion only when it rules without regard to any guiding rules or principles. ***Bedford***, 166 S.W.3d at 465. The mere fact that a trial judge may decide a matter within his discretionary authority in a different manner than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred. ***Downer v. Aquamarine Operators, Inc.***, 701 S.W.2d 238, 242 (Tex. 1985). Furthermore, a trial court's exclusion of evidence is harmful only if the evidence is controlling on a material issue and is not cumulative. *See **Mentis v. Barnard***, 870 S.W.2d 14, 16 (Tex. 1994); ***Franco v. Franco***, 81 S.W.3d 319, 321 (Tex. App.–El Paso 2002, no pet.). A successful challenge to an evidentiary ruling generally requires showing that the judgment turned on the particular evidence in dispute. ***Tex. Dep't of Transp. v. Able***, 35 S.W.3d 608, 617 (Tex. 2000). We examine the entire record in determining harm. *See **Interstate Northborough P'ship v. State***, 66 S.W.3d 213, 220 (Tex. 2001). We must uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling. ***Owens-Corning***, 972 S.W.2d at 43.

Evidence is relevant, and, therefore, admissible, if it has any tendency to "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX. R. EVID. 401, 402; *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 237–38 (Tex. 2011). To determine relevancy, the court must look at the purpose for offering the evidence. *Serv. Lloyds Ins. Co. v. Martin*, 855 S.W.2d 816, 822 (Tex. App.–Dallas 1993, no writ). There must be some logical connection, either directly or by inference, between the evidence offered and the fact to be proved. *See Rhey v. Redic*, 408 S.W.3d 440, 460 (Tex. App.–El Paso 2013, no pet.) (citing *Serv. Lloyds*, 855 S.W.2d at 822).

However, even relevant evidence may be inadmissible. Under Texas Rule of Evidence 403, a trial court may exclude evidence if its probative value is substantially outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 403; *Fitzpatrick v. Watson*, No. 12-08-00084-CV, 2010 WL 337330, at *3 (Tex. App.–Tyler Jan. 29, 2010, no pet.) (mem. op.). Testimony is not inadmissible on the sole ground that it is "prejudicial" because in our adversarial system, much of a proponent's evidence is legitimately intended to wound the opponent. *See Diamond Offshore Servs. Ltd. v. Williams*, 542 S.W.3d 539, 549 (Tex. 2018). Rather, unfair prejudice is the proper inquiry. *Id.* "Unfair prejudice" within this context means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.*

At the pretrial hearing on the matter and, later, in its offer of proof, Southwest argued that evidence of Hayden's post mortem toxicology test, which revealed a trace amount (2.2 nanograms per milliliter) of T.H.C., the active ingredient in marijuana, and Gill's knowledge that Hayden had consumed marijuana when he was in high school were relevant to the issue of his future earning capacity, particularly in light of Gill Electric's drug use policy. At the hearing, Southwest argued that evidence of Hayden's past marijuana use was relevant to his future earning capacity because such evidence supported a lack of sobriety and its connection to a reduced earning capacity was a matter of the jury's common knowledge. We disagree.

In support of its proposition, Southwest cites *Hadley v. International-Great Northern Railroad Company*, 268 S.W.2d 738 (Tex. Civ. App.–Texarkana 1954, writ dism'd), wherein the court stated, in pertinent part, as follows:

> The age, health, habits of industry, sobriety and economy of the plaintiff are legitimate matters of inquiry to enable the jury to determine the pecuniary loss incident to the injuries alleged . . . . If

the plaintiff be afflicted in mind or body, or if he be indolent, drunken and thriftless, the defendant ought to be permitted to prove the fact, so as to show that his earning capacity is not that of a person of ordinary endowments, mental or physical, and of ordinary habits.

*Id.* at 741.

Here, the excluded evidence at issue consists of a post-mortem toxicology test demonstrating that Hayden used marijuana on at least one occasion prior to his death[6] and testimony that his employer was aware that he used marijuana at some point when he was in high school. This evidence of isolated marijuana use, without more, simply does not tend to make the existence of any fact that is of consequence, such as Hayden's "habits" or his "sobriety," as those things relate to his future earning capacity, his ability to hold a job, or his ability to earn a living, any more probable than it would be without such evidence. *See* TEX. R. EVID. 401.

Southwest attempts to bridge the analytical gap between isolated marijuana use and future earning capacity by arguing that Gill Electric's supposed "zero tolerance" drug policy, when considered in conjunction with this excluded evidence, makes it more probable that he eventually would have been fired from his job at Gill Electric, would not have been hired elsewhere, and never would have achieved his goals of advancement in his field. But Southwest's argument is not borne out in its offer of proof. There, it repeatedly attempted to ask Gill about the rigidity of this "zero tolerance" policy. In the offer of proof, Gill not only declined to agree that Gill Electric's drug policy was "zero tolerance," but he equivocated on the rigidity of this policy again and again. Specifically, Gill testified in Southwest's offer of proof as follows:

> Q. In fact, sir, after this incident, you learned of a positive toxicology result for [Hayden]; is that correct, sir?
> A. I did.
>
> Q. Okay. I assume that Gill Electric has a no tolerance policy?
> A. I'm sorry?
>
> Q. A no tolerance policy on drugs --
> A. We -- we drug test, yes, we do.
>
> Q. And if something is found, positive test comes back, someone is terminated, right?
> A. We can terminate them, yes, sir.

---

[6] During the pretrial hearing, Davis argued that the amount of marijuana detected by the toxicology test was a trace or insignificant amount. Southwest did not contest Davis's argument to the trial court on this point.

Q. Okay. And, in fact, in this case, you did the random drug screen after this incident, and you determined everybody except, I think, one you told me, and that was somebody that came back to you and said, "Hey, we need to wait a little while" --
A. He came to me before the drug testing.

Q. That's right. So in this case, [Hayden] wouldn't have come to you before you would have found out about a positive result after the incident, right?
A. I didn't drug test him for that.

Q. I understand. But you understand he was drug tested as a result of this incident, right?
A. Yes.

Q. Okay. So let's say [Hayden] made it, okay, he didn't perish, he was just injured. As a result of this incident, Gill Electric would have terminated him; isn't that correct, sir?
A. I would have probably drug tested him if something severe happened to him, yes.

Q. And we know he tested positive on this [incident], right?
A. Yes, we do.

Q. And when you received that positive result, [Hayden] would have been terminated, correct?
A. I think it would have been at my discretion. I would have asked him what's going on. I would have found out what -- how much and what was he using; was it cocaine, was it pot. I think it's 100 percent our discretion.

Q. Okay. So let's talk about that for a minute. You had -- you'd known about [Hayden's] using pot in the past, right?
A. I knew when he was younger, he did a lot of silly things.

. . . .

Q. You were aware that [Hayden] had a history of using pot?
A. I knew he did when he was young.

Q. Okay. Well, he -- he was what, 24, on the day of the incident?
A. Almost 25.

Q. Almost 25, okay. So this was back in his teenage years, I assume, or do you know?
A. I'm assuming during his -- his high school years.

Q. But he had informed you that that was all behind him, he wasn't doing that anymore, right?
A. He did.

Q. But the evidence clearly shows to the contrary, right?
A. I could tell after the incident that he failed the drug test, yes.

Q. Well, and you're aware that to fail a drug test, you have to use marijuana, right?
A. Yes.


It is apparent from Gill's testimony in Southwest's offer of proof that not only was Gill Electric's drug policy not "zero tolerance," but also that there was a degree of flexibility in this policy, which was subject to Gill's sole discretion. Most tellingly, his testimony reveals that

following Hayden's death, he tested all of his employees for drugs but allowed one employee to delay his test for "a little while." It further reveals that a failed drug test based on marijuana use, particularly when it came to an employee like Hayden, who he testified elsewhere that he thought of "as a son," was unlikely to result in that employee's termination.

Southwest further contends that the jury could apply its common knowledge of community standards to find that Hayden's past, isolated, marijuana use would prove so detrimental to his career prospects that he never would earn more than he did at age twenty-four. *See Missouri Pac. R. Co. v. Kimbrell*, 334 S.W.2d 283, 286 (Tex. 1960) (jury has power to consider as proven any matter that is of common knowledge in community). We disagree.[7] The dichotomy of Southwest's argument is revealed in its brief. On the one hand, it contends that evidence of any marijuana use by Hayden is relevant to support a jury finding that he was, as a result, consigned to a lifetime of unremarkable financial prospects. Yet, on the other hand, it argues that the prejudicial impact, if any, of Hayden's marijuana use was minimal because "marijuana use is not as controversial as it once was, and it is a matter easily understandable by a jury." We recognize that there could be circumstances under which marijuana use might be impactful on an individual's career prospects and earning capacity. But we cannot conclude in this case that a jury with knowledge of the excluded evidence of Hayden's isolated marijuana use reasonably could make the finding that such usage was detrimental to his earning capacity based on its common knowledge of contemporary community standards. *Cf. Kimbrell*, 334 S.W.2d at 286.

Lastly, Southwest argues that Davis opened the door to the admission of the excluded evidence by eliciting testimony that Hayden potentially could reach the level of master electrician, wherein he could earn in excess of $80,000.00 annually. The concept of an attorney's "opening the door" to what would otherwise be inadmissible evidence or testimony on cross examination is based upon the fact that once the opposing party has opened an inquiry into a particular subject, that party cannot complain when the other party desires to go into the details

---

[7] As Southwest notes in its brief, possession of marijuana for personal use in Texas generally is a misdemeanor. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.121(b)(1) (West 2017). But in this case, there is no evidence that Hayden ever was convicted of the offense of possession of marijuana. Furthermore, the question here—whether the jury reasonably could adopt, as fact, its knowledge of community standards—relates to the jury's understanding of Hayden's past, isolated marijuana use and how such use might reasonably affect his ability to earn a living in the ensuing decades. We do not agree, absent a conviction, that the misdemeanor status for possession of a small amount of marijuana has any bearing on this determination.

of that subject. *Moreno v. Tex. Dep't of Transp.*, 440 S.W.3d 889, 893 (Tex. App.–El Paso 2013, pet. denied). But a party seeking admission of otherwise inadmissible evidence pursuant to Texas Rule of Evidence 107 must satisfy two threshold requirements.[8] *See Crosby v. Minyard Food Stores, Inc.*, 122 S.W.3d 899, 903 (Tex. App.–Dallas 2003, no pet.). First, some portion of the matter sought to be "completed" must actually have been introduced into evidence. *Id.* at 903. Second, the party seeking to complete the matter must show that the remainder being offered under Rule 107 is on the same subject and is necessary to fully understand or explain the matter. *Id.* Here, as set forth above, Davis's eliciting testimony about Hayden's potential to advance in his career bears no relation to evidence of past, isolated instances of marijuana use on his part because the excluded evidence, without more, did not demonstrate habitual use or an ongoing impact on his sobriety. *See* Tex. R. Evid. 401; *Hadley*, 286 S.W.2d at 741. Furthermore, the excluded evidence is not on the same subject, nor is it necessary to fully understand or explain Hayden's future earning capacity. *See* Tex. R. Evid. 401; *Hadley*, 286 S.W.2d at 741. Therefore, we conclude that Southwest was not entitled to have the excluded evidence admitted pursuant to Rule 107.

Because the excluded evidence did not make the existence of any fact that is of consequence to the determination of Hayden's future earning capacity more probable or less probable than it would be without the evidence, we hold that it was not relevant. *See* Tex. R. Evid. 401. Therefore, the trial court did not abuse its discretion in excluding the evidence. *See* Tex. R. Evid. 402. Southwest's second issue is overruled.

## BATSON CHALLENGE

In its third issue, Southwest argues that the trial court abused its discretion by sustaining Davis's *Batson*[9] challenge because Davis failed to prove Southwest engaged in purposeful racial discrimination.

---

[8] Rule 107, entitled "Rule of Optional Completeness" states, in pertinent part, that "[w]hen part of an act, declaration, conversation, writing or recorded statement is given in evidence by one party, the whole on the same subject may be inquired into by the other, and any other act, declaration, writing or recorded statement which is necessary to make it fully understood or to explain the same may also be given in evidence[.]" Tex. R. Evid. 107.

[9] *See Batson v. Kentucky*, 476 U.S. 79, 86, 106 S. Ct. 1712, 1717, 90 L.Ed.2d 69 (1986).

## Standard of Review and Governing Law

We review a trial court's **Batson** ruling for an abuse of discretion. **Davis v. Fisk Elec. Co.**, 268 S.W.3d 508, 515 (Tex. 2008). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding rules or legal principles. **Goode v. Shoukfeh**, 943 S.W.2d 441, 446 (Tex. 1997).

Our rules generally permit each party in a civil action in district court to exercise six peremptory strikes which, are used to "strike" potential jurors without offering any reason or explanation. TEX. R. CIV. P. 232, 233. While no reasons for the strikes are required, peremptory strikes exercised for an improper reason, such as race, are unconstitutional. **Batson**, 476 U.S. at 89, 106 S. Ct. at 1719.

A **Batson** challenge is resolved using a three-step process. *See* **Murphy v. Arcos**, 615 S.W.3d 676, 686 (Tex. App.–Dallas 2020, pet. filed) (citing **Davis**, 268 S.W.3d at 514 n.4). At the first step, the party challenging the peremptory strike must establish a prima facie case of racial discrimination. *See* **Batson**, 476 U.S. at 96–97, 106 S. Ct. at 1723; **Davis**, 268 S.W.3d at 514 n.4. To establish a prima facie case, the challenging party may rely on "the totality of the relevant facts" giving rise to an inference of discriminatory purpose. **Batson**, 476 U.S. at 93–94, 106 S. Ct. at 1721.

Once a prima facie case has been established, at the second step, the burden shifts to the striking party to come forward with a race-neutral explanation for the strikes. **Id.** 476 U.S. at 97, 106 S. Ct. at 1723; **Davis**, 268 S.W.3d at 514 n.4. The race-neutral explanation is a burden of production only. *See* **Peetz v. State**, 180 S.W.3d 755, 758–59 (Tex. App.–Houston [14th Dist.] 2005, no pet.). This means that the reason offered need not be "persuasive or even plausible," so long as it is clear, reasonably specific, and "based on something other than the juror's race." **Purkett v. Elem**, 514 U.S. 765, 768, 115 S. Ct. 1769, 1771, 131 L.Ed.2d 834 (1995); **Goode**, 943 S.W.2d at 445. Thus, at this second step, the trial court's sole task is to determine whether the explanation is facially valid. **Purkett**, 514 U.S. at 768, 115 S. Ct. at 1771.

If the striking party offers a race-neutral explanation, at the third step, the challenging party must prove purposeful racial discrimination. *See* **Batson**, 476 U.S. at 98, 106 S. Ct. at 1724; **Davis**, 268 S.W.3d at 514 n.4. At this step, the persuasiveness of the justification for the peremptory strike is the critical issue, and "implausible or fantastic justifications may (and

13

probably will) be found to be pretexts for purposeful discrimination." *Purkett*, 514 U.S. at 768, 115 S. Ct. at 1771.

In making its pretext determination, the trial court must consider "all relevant circumstances." *Batson*, 476 U.S. at 96, 106 S. Ct. at 1723; *Davis*, 268 S.W.3d at 516–24. In so doing, certain factors are especially probative, including (1) whether a statistical disparity exists between the percentage of black and non-black potential jurors who were struck, (2) whether the record supports or contradicts the striking party's explanation for its strikes, (3) whether the striking party questioned the black panelists before striking them, and (4) whether there is any disparate treatment of black panelists, i.e., whether the striking party's explanations for striking black jurors apply equally well to non-black jurors who were not struck. *See Davis*, 268 S.W.3d at 518–19; *Jackson v. Stroud*, 539 S.W.3d 502, 508 (Tex. App.–Houston [1st Dist.] 2017, no pet.). The existence of any one of these factors tends to show that the striking party's reasons are not actually supported by the record or are an impermissible pretext. *Brumfield v. Exxon Corp.*, 63 S.W.3d 912, 917 (Tex. App.–Houston [14th Dist.] 2002, pet. denied).

Ultimately, on *Batson* issues, the trial judge's assessment of a lawyer's credibility often is important, and the best evidence frequently is the striking lawyer's demeanor. *See Flowers v. Mississippi*, 139 S. Ct. 2228, 2243–44, 204 L. Ed. 2d 638 (2019). Thus, *Batson* issues "lie peculiarly within a trial judge's province" and its findings should be given "great deference." *Id.* at 2244.

**Discussion**

In the instant case, Southwest used a peremptory strike against venire member number six, who is a black female. The record reflects that Southwest exercised peremptory strikes against all three black venire members within the "strike zone," as well as three non-black venire members. *See, e.g.*, *Woods v. State*, 801 S.W.2d 932, 940 (Tex. App.–Austin 1990, pet. ref'd) (appellant established strong prima facie case of purposeful discrimination, including fact that state used peremptory challenges to exclude all black venire members). In explaining the reasoning behind exercising this strike, Southwest related to the trial court that it sought to strike her because of her lack of education and because of her job as a custodian for Pine Tree Independent School District. Southwest's counsel elaborated somewhat with regard to her education level, explaining that he had "bad experiences with people that don't have educations [sic]" and although some other panelists did not have college degrees, due to other statements

they made during voir dire, "we felt good about the other ones." *See Lott v. City of Fort Worth*, 840 S.W.2d 146, 153 (Tex. App.–Fort Worth 1992, no writ) (while assessing venire member's intelligence is highly subjective, simply stating that venire member "didn't appear to be quite that swift," without more is insufficient to overcome presumption of discrimination in *Batson* hearing). Southwest's counsel offered no substantive explanation of the correlation between the venire member's job as a custodian and her ability to serve on the jury. Rather, he sought to defend the strike in this regard, saying only that because venire member number six worked as a custodian, "we did not feel that she would be a good juror for our defendants."

Further, the record does not indicate that Southwest engaged with venire member number six in any meaningful way. *See Jackson*, 539 S.W.3d at 511 (failure to question panelist about reason given for strike suggests pretext); *see also, e.g.*, *Woods*, 801 S.W.2d at 937 (no examination, or only perfunctory examination of challenged venire member weighs heavily against legitimacy of a facially race-neutral explanation and may illustrate sham or pretext). And with regard to venire member number six's education, we reiterate, as Davis notes in his brief, that Southwest declined to exercise peremptory strikes against other venire members who lacked more than a high school education merely because it "felt good" about those venire members. *See, e.g.*, *Mayr v. Lott*, 943 S.W.2d 553, 558 (Tex. App.–Waco 1997, no writ) (explanation that attorney ran out of strikes does not remove the taint of striking a black juror who shared same characteristic as white juror and only highlights fact that attorney had choice between two similarly situated people and chose to strike the one who is black).[10]

We have reviewed the record and considered it in light of the aforementioned factors. Having done so, we note that Davis made a strong case supporting the existence of a statistical disparity between the percentage of black and non-black venire members who were struck, a record contradicting Southwest's explanation for its strike, and Southwest's lack of engagement with venire member number six during voir dire. We further note that Southwest engaged in disparate treatment of venire member number six on the subject of education by comparison to non-black jurors who were not struck. *See Davis*, 268 S.W.3d at 518–19; *Jackson*, 539 S.W.3d

---

[10] *But see* **Green v. State**, 839 S.W.2d 935, 939 (Tex. App.–Waco 1992, writ ref'd) (holding that disparate treatment not shown when attorney gave second, independent reason for striking nonwhite venire member). Here, Southwest explained that one other venire member, who likewise lacked a college education, was not struck because he answered questions regarding "lockout/tagout" procedures satisfactorily and, also, had experience doing electrical work on his own. While this is an independent basis for the strike of that venire member, we note that Southwest declined to question venire member number six about her knowledge of this procedure or as to whether she had any experience doing electrical work on her own.

15

at 508. But in the case of one of these venire members, it offered an independent basis for the strike, despite the fact that it did not question venire member number six on that basis. Still, we reiterate that **Batson** issues "lie peculiarly within a trial judge's province," that its findings should be given "great deference," and that the existence of any one of the aforementioned factors tends to show that the striking party's reasons are pretextual. *See Flowers*, 139 S. Ct. at 2244; **Brumfield**, 63 S.W.3d at 917. Accordingly, we hold that the trial court, which was in the best position to judge Southwest's counsel's demeanor, did not abuse its discretion in sustaining Davis's **Batson** challenge to Southwest's peremptory strike against venire member number six. Southwest's third issue is overruled.

### JURY ARGUMENT-SETTLEMENT

In its fourth issue, Southwest argues that Davis engaged in incurable jury argument by referencing settlements to other defendants during his opening statement and that the trial court abused its discretion in denying its motion for mistrial.

### Standard of Review and Governing Law

Control of counsel's conduct during jury argument rests in the sound discretion of the trial court. **Richmond Condominiums v. Skipworth Commercial Plumbing, Inc.**, 245 S.W.3d 646, 667 (Tex. App.–Fort Worth 2008, pet. denied); **Wells v. HCA Health Servs. of Tex., Inc.**, 806 S.W.2d 850, 854 (Tex. App.–Fort Worth 1990, writ denied). The test for improper jury argument is whether the argument could have persuaded a juror of ordinary intelligence to agree to a verdict contrary to that to which he would have agreed but for the argument. *See Welch v. McLean*, 191 S.W.3d 147, 161 (Tex. App.–Fort Worth 2005, no pet.) (op. on reh'g). Reversal is required only when the entire record shows that argument was improper, uninvited and unprovoked, preserved by a timely objection, and incurable by instruction, withdrawal, or trial court reprimand. **Richmond Condominiums**, 245 S.W.3d at 668; *see Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839 (Tex. 1979). An appellate court presumes, subject to rebuttal, that a jury will follow a trial court's instruction to disregard. *See Cook v. Caterpillar, Inc.*, 849 S.W.2d 434, 441 (Tex. App.–Amarillo 1993, writ denied); *see also Duncan v. Smith*, 393 S.W.2d 798, 805 (Tex. 1965).

Further, an appellant must show that the argument constituted harmful error by its nature, degree, and extent. **Richmond Condominiums**, 245 S.W.3d at 668 (citing **Standard Fire**, 584

S.W.2d at 839).  The party seeking reversal based on an allegedly improper argument must show that the probability that the improper argument caused harm is greater than the probability that the verdict was grounded on the proper proceedings and evidence.  *Richmond Condominiums*, 245 S.W.3d at 668 (citing *Standard Fire*, 584 S.W.2d at 840).

**Discussion**

In the instant case, Southwest complains that Davis made reference to settlement negotiations in violation of Texas Rule of Evidence 408 and the trial court's order on Southwest's motion in limine as follows:

> When Southwest Solutions was sued, they not only denied doing this, but they turned around and sued another -- a number of other companies and individuals at this site, pointing the finger at them.
>
> I advised my clients that "I don't know what they know, I don't know what happened. And so out of an abundance of caution, you need to sue these other companies, too, and see if there's anything to what Southwest is doing."
>
> Every one of those companies and individuals were dismissed from this case because there was no evidence to support those claims.  And more importantly, not one of those companies or individuals ever had to pay a dime to this family.  But you need to be aware of the fact --

Southwest objected, but the trial court addressed its objection in a bench conference off the record and, thus, the substance of the objection is not apparent.  *See* TEX. R. APP. P. 33.1. Nonetheless, the trial court instructed the jury to disregard Davis's last statement "about payment, non-payment from third parties that are not before this court."

Texas Rule of Evidence 408 states in pertinent part as follows:

> Evidence of the following is not admissible either to prove or disprove the validity or amount of a disputed claim:
>
> (1) furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim; and
>
> (2)  conduct or statements made during compromise negotiations about the claim.

TEX. R. EVID. 408.  Furthermore, the trial court's order on Southwest's motion in limine included "[a]ny mention of settlement negotiations as such is not allowed under Rule 408."

First, we disagree that Davis's counsel's statement that these other companies "were dismissed from this case because there was no evidence" to support claims against them and that

17

none of "those companies or individuals ever had to pay a dime to this family" violates Rule 408 or the trial court's order on its motion in limine. Davis's counsel made no reference to any company's or person's "furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromise or attempting to compromise" any of Davis's claims. *See id.* Furthermore, Davis's counsel did not reference any conduct or statements made during compromise negotiations about its claims. *See id.* We simply cannot conclude that this statement, without more, violated Rule 408.

But even assuming arguendo that Davis's counsel's statement encroached on the spirit of Rule 408, the trial court instructed the jury to disregard the statement. *See Cook*, 849 S.W.2d at 441; *see also Duncan*, 393 S.W.2d at 805. Southwest argues that the presumption that the jury followed the trial court's instruction is rebutted by the fact that the jury found that Southwest's responsibility was apportioned at forty percent. We disagree.

Incurable jury argument occurs when comments are so inflammatory that their harmful nature cannot be cured by an instruction to disregard. *Columbia Med. Ctr. of Las Colinas v. Bush ex rel. Bush*, 122 S.W.3d 835, 862 (Tex. App.–Fort Worth 2003, pet. denied); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Kwiatkowski*, 915 S.W.2d 662, 664 (Tex. App.–Houston [14th Dist.] 1996, no writ.). There only are rare instances of incurable harm from improper argument. *Standard Fire*, 584 S.W.2d at 839; *Bush*, 122 S.W.3d at 862. Although an offer in compromise and settlement is inadmissible as evidence, error in informing a jury of a settlement can be cured by an instruction to disregard. *Bush*, 122 S.W.3d at 862 (citing TEX. R. EVID. 408; *Beutel v. Paul*, 741 S.W.2d 510, 513–14 (Tex. App.–Houston [14th Dist.] 1987, no writ); *Parks v. Benson Co., Builders*, 393 S.W.2d 700, 703 (Tex. Civ. App.–Fort Worth 1965, writ ref'd n.r.e.)). Furthermore, the jury heard testimony that Southwest's owner contacted Gill after the accident and told him that he had his technician "bootleg" the wiring in order to get the equipment up and running, which, even though contradicted by other testimony, certainly could support its determination in partially apportioning liability to Southwest. Therefore, we hold that Davis's counsel's statement in opening argument did not violate Rule 408 and, even assuming arguendo that it did, the trial court's instruction cured any error. Southwest's fourth issue is overruled.

18

**RESPONSIBLE THIRD-PARTY DESIGNATION OF IMMUNE EMPLOYER**

In its second cross point, Davis argues that the trial court committed reversible error when it refused its requests to strike the designation of Gill Electric as a responsible third party because Gill Electric, as a subscriber to a workers' compensation insurance plan, is an immune employer under the Texas Workers' Compensation Act.

Texas Civil Practice and Remedies Code, Section 33.004(*l*), which governs designations of responsible third parties, sets forth, in pertinent part, as follows:

> After adequate time for discovery, a party may move to strike the designation of a responsible third party on the ground that there is no evidence that the designated person is responsible for any portion of the claimant's alleged injury or damage. The court shall grant the motion to strike unless a defendant produces sufficient evidence to raise a genuine issue of fact regarding the designated person's responsibility for the claimant's injury or damage.

TEX. CIV. PRAC. & REM. CODE ANN. § 33.004(*l*) (West 2020). The "no evidence" ground set forth by the legislature is the only ground upon which a trial court may strike a designation of a responsible third party. *See In re Yamaha Golf-Car Co.*, No. 05-19-00292-CV, 2019 WL 1512578, at *1 (Tex. App.–Dallas Apr. 8, 2019, no pet) (mem op.); *In re Brokers Logistics, Ltd.*, 320 S.W.3d 402, 407 (Tex. App.–El Paso 2010, no pet.) ("Section 33.004(*l*) articulates a single ground for striking a designation of a responsible third party. If the Legislature had intended to authorize trial courts to strike designations on any other ground it could have easily indicated that intent in the statute. It did not").

In the instant case, Davis does not argue that trial court abused its discretion in denying his motion to strike because there is no evidence that Gill Electric is responsible for any portion of his injuries. Therefore, we hold that the trial court did not abuse its discretion in overruling his motion to strike. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.004(*l*).

Nonetheless, Davis raises numerous arguments unrelated to the standard of proof required by the Legislature to strike a responsible third-party designation. He first argues that Section 33.004 provides for designation only for some immune parties but not immune employers and, further, that under Section 33.002(a)(1), responsible third-party designations only are authorized when there is a cause of action against the designee. *See, e.g.*, *id*. §§ 33.002(a)(1) (West 2020), 33.004(d). However, following the 2003 Amendments, the definition of a responsible third party was broadened to include persons who are not subject to the trial court's

jurisdiction or are immune from liability to the claimant, including a claimant's employer which is a subscriber to the workers' compensation system. *See In re Unitec Elevator Services Co.*, 178 S.W.3d 53, 58 n.5 (Tex. App.–Houston [1st Dist.] 2005, no pet.); *see also Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 868–69 (Tex. 2009) (defendant may designate responsible third party even though that party possesses defense to liability, or cannot be formally joined as defendant, or both); *New Hampshire Ins. Co. v. Rodriguez*, 569 S.W.3d 275, 2999 (Tex. App.–El Paso 2019, pet. denied) (noting that following 2003 amendments, even though subscribing employer remained immune from suit, employer's negligence could now be placed at issue before jury and thereby (1) proportionally reduce employee's recovery and (2) allow other parties' negligence to be viewed in context of all potential negligence at large). Thus, we conclude that the interpretation of the unambiguous language[11] of Sections 33.002(a)(1) and 33.004(*l*) that Davis proposes is too restrictive.

### *Davis's Due Process Rights*

Davis next argues that Gill Electric's designation as a responsible third party violated Davis's substantive due process rights under both the United States and Texas constitutions. The Due Process Clause of the Fourteenth Amendment encompasses both substantive and procedural due process. *City of Dallas v. Saucedo-Falls*, 268 S.W.3d 653, 660 (Tex. App.–Dallas 2008, pet. denied); *Byers v. Patterson*, 219 S.W.3d 514, 524–26 (Tex. App.–Tyler 2007, no pet.). A violation of substantive due process occurs when the government deprives individuals of constitutionally protected rights by an arbitrary use of power. *Reynoso v. Dibs US, Inc.*, 541 S.W.3d 331, 338 (Tex. App.–Houston [14th Dist.] 2017, no pet.); *Montrose Mgmt. Dist. v. 1620 Hawthorne, Ltd.*, 435 S.W.3d 393, 409 (Tex. App.–Houston [14th Dist.] 2014, pet. denied). Substantive due process can apply to a legislative act or to certain types of nonlegislative state action. *Gatesco Q.M. Ltd. v. City of Houston*, 503 S.W.3d 607, 618 (Tex. App.–Houston [14th Dist.] 2016, no pet.). A plaintiff challenging a statute or state action must shoulder the burden to prove a violation of substantive due process. *Id.* We presume statutes are constitutional. *See Patel v. Tex. Dept. of Licensing and Regulation*, 469 S.W.3d 69, 87 (Tex. 2015); *Spring Branch I.S.D. v. Stamos*, 695 S.W.2d 556, 558 (Tex. 1985). Similarly, we presume a state actor

---

[11] When we construe a statute, our ultimate purpose must be to give effect to the Legislature's intent. *Union Bankers Ins. Co. v. Shelton*, 889 S.W.2d 278, 280 (Tex. 1994). We resort to rules of construction only when the statute in question is ambiguous. *See Tex. Water Comm'n v. Brushy Creek Mun. Util. Dist.*, 917 S.W.2d 19, 21 (Tex. 1996).

acted in a constitutional manner. ***Gatesco Q.M. Ltd.***, 503 S.W.3d at 618. When neither a suspect classification nor a fundamental right is involved, we review statutes and actions of state actors under the deferential rational-basis test. *See **In re Estate of Touring***, 775 S.W.2d 39, 42 (Tex. App.–Houston [14th Dist.] 1989, no pet.); ***Gatesco Q.M. Ltd.***, 503 S.W.3d at 618. Under this test, the claimant must prove that it is not at least "fairly debatable" that the statute or conduct rationally relates to a legitimate governmental interest. ***In re Estate of Touring***, 775 S.W.2d at 42; *see **Gatesco Q.M. Ltd.***, 503 S.W.3d at 618. On the other hand, a procedural due process violation occurs when a government makes decisions without appropriate safeguards. *See **Patterson***, 219 S.W.3d at 526.

Although Davis frames his argument as pertaining to substantive due process, he makes no reference to the deferential rational-basis test, nor does he contend in any discernible way that it is not "fairly debatable" that Chapter 33 rationally relates to a legitimate governmental interest. Instead, he contends that the statute lacks important safeguards to prevent the factfinder's assignment of a disproportionate share of responsibility to an immune nonparty, thereby depriving Davis of a portion of his damages. In response, Southwest points out that Chapter 33 does contain safeguards, such as (1) notice to the plaintiff of the defendant's intention to assign blame to a nonparty, (2) a limitation of time within which notice of a nonparty claim must be made, and (3) a requirement that the defendant prove a nonparty contributed to a portion of the plaintiff's injuries. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.004. Southwest also notes that the Workers' Compensation Act provides an alternate form of relief for recovery against an immune employer that offsets the reduction of a plaintiff's recovery at trial. *See* TEX. LABOR CODE ANN. §§ 408.181–183 (West 2006). Davis makes no attempt to address these safeguards or to distinguish them. Based on the arguments in his brief, we cannot conclude that Davis carried his burden to demonstrate that Chapter 33 violates either his rights of substantive or procedural due process. Thus, we must presume the statutes are constitutional. *See **Patel***, 469 S.W.3d at 87.

### *Open Courts*

Davis further asserts that Gill Electric's designation as a responsible third party violated Davis's rights under the Texas Constitution's "open courts" provision. The open courts provision of the Texas Constitution states, "All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of

21

law." TEX. CONST. ANN. art. I § XIII (West 2007). This provision prohibits legislative bodies from withdrawing arbitrarily all legal remedies from one having a cause of action well established and well defined in the common law. *See Lebohm v. City of Galveston*, 275 S.W.2d 951, 954 (Tex. 1955). However, the open courts provision does not apply to statutory claims. *Rose*, 801 S.W.2d at 845.

Here, as Davis notes in his brief, negligence claims are common law claims. *See id.* at 845. However, at common law, no personal injury cause of action survived a victim's death, nor could the victim's heirs sue on behalf of the victim or for their own losses due to the tortious act. *See Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 903 (Tex. 2000). Therefore, because Davis's wrongful death and survival causes of action are statutory, the open court's provision does not apply. *See id.*

### Gill Electric's Due Process Rights

Lastly, Davis argues that Gill Electric's designation as a responsible third party violated Gill Electric's procedural due process rights in its good name and reputation. Davis argues that he has standing to bring this challenge because the same constitutional violation also adversely affects him.

A party's standing to sue is implicit in the concept of subject matter jurisdiction and is not presumed; rather, it must be proved. *See Linegar v. DLA Piper LLP (US)*, 495 S.W.3d 276, 279 (Tex. 2016) (citing *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445–46 (Tex. 1993)). Standing is a question of law for the court to determine, although facts necessary to the determination may need to be determined by the factfinder. *See Linegar*, 495 S.W.3d at 279; *West v. Brenntag Sw., Inc.*, 168 S.W.3d 327, 334 (Tex. App.–Texarkana 2005, pet. denied). The Texas Supreme Court has summarized general standing principles, in pertinent part, as follows:

> In Texas, the standing doctrine requires a concrete injury to the plaintiff and a real controversy between the parties that will be resolved by the court . . . . The plaintiff must be personally injured—he must plead facts demonstrating that he, himself (rather than a third party or the public at large) suffered the injury . . . . [The injury] must be concrete and particularized, actual or imminent, not hypothetical . . . . [T]he plaintiff's alleged injury must be fairly traceable to the defendant's conduct . . . . [And] the plaintiff's alleged injury [must] be likely to be redressed by the requested relief.

*Heckman v. Williamson Cty.*, 369 S.W.3d 137, 154–55 (Tex. 2012) (emphasis omitted) (citations omitted). The standing analysis begins with a determination of the nature of the wrong being alleged and whether there was a causal connection between a defendant's conduct and the injury caused by the alleged wrong. *See id.* Standing is assessed on a claim-by-claim basis. *Id.* at 153.

In the instant case, the alleged wrong—Gill Electric's failure to receive notice of its designation and the opportunity to be heard on the matter—bears no relation to Davis's injury—the reduction in the amount of his award by forty percent. Instead, Davis's injury is attributable to the Legislature's decision to amend Chapter 33, which, as set forth previously, has been held to include the designation of employers as responsible third parties. Therefore, we hold that in this instance, Davis lacks standing to raise due process arguments on Gill Electric's behalf. *See id.* Davis's second cross point is overruled.

## CONCLUSION

In our analysis of Davis's first cross point, we determined that the trial court's suggestion of remittitur of the awards of future pecuniary damages to Calli and Grace was appropriate, but the amount suggested was excessive. Therefore, we *reverse* the trial court's amended judgment insofar as it awards damages for future pecuniary loss to Calli and Grace, and *modify* it to reinstate, subject to further dispositions below, the jury's award for damages for future pecuniary loss to Calli in the amount of $1,000,000.00 and to Grace in the amount of $750,000.00.

Ultimately, however, we overruled Davis's first cross point. Because the jury's award for future pecuniary loss to Calli and Grace is against the great weight and preponderance of the evidence, we suggest a remittitur of the jury's award of damages for future pecuniary loss to Calli in the amount of $462,000.00 and Grace in the amount of $128,000.00, which would result in an award for Calli in the amount of $538,000.00 and for Grace in the amount of $622,000.00. If Davis timely files the remittitur in this court **within ten (10) days** of the date of this opinion, that portion of the trial court's judgment will be reformed and affirmed. *See* TEX. R. APP. P. 46.3; *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. and Research Corp.*, 299 S.W.3d 106, 124 (Tex. 2009).

However, if Davis does not timely file the remittitur, we will *reverse* that portion of the trial court's judgment and *remand* for a new trial on liability and damages. *See* TEX. R. APP. P.

44.1(b) ("If the error affects part of, but not all, the matter in controversy and that part is separable without unfairness to the parties, the judgment must be reversed and a new trial ordered only as to the part affected by the error. [But t]he court may not order a separate trial solely on unliquidated damages if liability is contested"); *see also* **Estrada v. Dillon** 44 S.W.3d 558, 562 (Tex. 2001) (if party files general denial in trial court, plaintiff is put to his or her proof on all issues, including liability; its effect extends to contesting liability in event of remand on appeal; party's failure to present on appeal an additional discreet challenge to liability when party challenges damages does not defeat plain language of Rule 44.1(b) proscribing separate trial on unliquidated damages when liability is contested); TEX. R. APP. P. 46.5.

Having overruled Southwest's first, second, third, and fourth issues and Davis's second cross point, we *affirm* the trial court's judgment *as modified* in all other respects.

<u>**BRIAN HOYLE**</u>
Justice

Opinion delivered March 18, 2021.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

24



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# <u>ORDER</u>

**MARCH 18, 2021**

**NO. 12-19-00384-CV**

**THURSTON, OWENS & NEWMAN, L.L.C., D/B/A SOUTHWEST RESTAURANT & BEVERAGE SOLUTIONS, APPELLANTS/CROSS-APPELLEES,**
Appellants
V.
**JERRY DAVIS, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF HAYDEN DAVIS, KAREN DAVIS, AND SUMMER HERNANDEZ, AS NEXT FRIEND OF G.L.D. AND C.N.D., APPELLEES/CROSS-APPELLANTS,**
Appellees

---

Appeal from the County Court at Law No. 2

of Gregg County, Texas (Tr.Ct.No. 2017-2475-CCL2)

---

THIS CAUSE came to be heard on the appellate record and the briefs filed herein, and the same being considered, it is the opinion of this court that there was error in the amended judgment of the court below insofar as the trial court's suggestion of remittitur of the awards of future pecuniary damages to **CALLI DAVIS** and **GRACE DAVIS** was appropriate, but the respective amounts of remittitur suggested were excessive.

It is therefore ORDERED, ADJUDGED, and DECREED that that portion of the trial court's amended judgment awarding damages for future pecuniary loss in the amount of $425,000.00 to **CALLI DAVIS** and $475,000.00 to **GRACE DAVIS** be **reversed** and **modified** to reinstate, subject to further adjudications below, the jury's award for damages for future pecuniary loss to **CALLI DAVIS** in the amount of $1,000,000.00 and to **GRACE DAVIS** in the amount of $750,000.00.

It is further the opinion of this court that there was error in the amended judgment as modified insofar as the jury's award for future pecuniary loss for **CALLI DAVIS** in the amount of $1,000,000.00 and to **GRACE DAVIS** in the amount of $750,000.00 is against the great weight and preponderance of the evidence.

It is therefore ORDERED, ADJUDGED, and DECREED that that portion of the trial court's amended judgment, as modified, awarding damages for future pecuniary loss in the amount of $1,000,000.00 to **CALLI DAVIS** and $750,000.00 to **GRACE DAVIS** be **reversed**, and we suggest a **remittitur** of the jury's award of damages for future pecuniary loss to **CALLI DAVIS** in the amount of $462,000.00 and to **GRACE DAVIS** in the amount of $128,000.00, which would, thereby, result in an award for future pecuniary loss **CALLI DAVIS** in the amount of $538,000.00 and to **GRACE DAVIS** in the amount of $622,000.00. If Appellee timely files the remittitur in this court **within ten (10) days** of the date of this opinion, that portion of the trial court's judgment will be **reformed** and **affirmed**. If Appellee does not timely file the remittitur, we will *reverse* that portion of the trial court's judgment and *remand* for a new trial on liability and damages.

The remaining portion of the trial court's amended judgment is **affirmed**; all costs shall be assessed against Appellant, **THURSTON, OWENS & NEWMAN, L.L.C., D/B/A SOUTHWEST RESTAURANT & BEVERAGE SOLUTIONS**, for which let execution issue; and that the decision be certified to the court below for observance.

Brian Hoyle, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*